**UNITED STATES of America**

**v.**

**Sami Amin AL–ARIAN Sameeh Hammoudeh Ghassan Zayed Ballut Hatim Naji Fariz**

**No. 8:03–CR–77–T–30TBM.**

United States District Court, M.D. Florida. Tampa Division.

March 12, 2004.

---

See, also, 267 F.Supp.2d 1258.

Jeffrey Geldert Brown, Florin, Roebig &
Walker, P.A., Palm Harbor, FL, Franklyn
Louderback, Louderback and Helinger, St.
Petersburg, FL, Sami Amin Al–Arian, pro
se, FCI Coleman, Coleman, FL, Nicholas
M. Matassini, The Matassini Law Firm,
P.A., Tampa, FL, William B. Moffitt, Asbill
Moffitt & Boss, Chtd., The Pacific House,
Washington, DC, ·Linda G. Moreno, Law
Office of Linda Moreno, Tampa, FL, for
Sami Amin Al–Arian (1) aka Amin aka Abu
Abdullah aka The Secretary, defendant.

Richard P. Condon, Law Office Of Richard P. Condon, Kissimmee, FL, Stephen N. Bernstein, Stephen N. Bernstein, P.A., Gainesville, FL, Daniel Mario Hernandez, Law Office of Daniel M. Hernandez, Tampa, FL, for Sameeh Hammoudeh (4) aka Sameeh Hamouda aka Abu Anas, defendant.

Bruce G. Howie, Piper, Ludin, Howie & Werner, P.A., St. Petersburg, FL, Ghassan Zayed Ballut, Tinley Park, IL, for Ghassan Zayed Ballut (7) aka Abu Fadi, defendant.

Donald E. Horrox, Kevin T. Beck, M. Allison Guagliardo, Wadie E. Said, Federal Public Defender's Office, Middle District of Florida, Hatim Naji Fariz, Tampa, FL, for Hatim Naji Fariz (8) aka Abu Obayada aka Abu Obaida, defendant.

Walter E. Furr, U.S. Attorney's Office, Middle District of Florida, Tampa, FL, Daniel W. Eckhart, U.S. Attorney's Office, Middle District of Florida, Orlando, FL for U.S.

## *ORDER*

MOODY, District Judge.

THIS CAUSE came before this Court upon:

1. Defendant Ballut's Motion to Dismiss or Strike Counts 1 through 4, 19, 36 through 38, and 40 through 42 (Dkt.# 200) and the government's response (Dkt.# 347) thereto;

2. Defendant Al–Arian's Motion to Dismiss Counts 1, 2, 3 and 4 of the Indictment (Dkt.# 245), the government's response (Dkt.# 346), and Al–Arian's reply (Dkt.# 425) thereto;

3. Defendant Fariz's Motion to Dismiss Count 44 of the Indictment (Dkt.# 250) and the government's response (Dkt.# 347) thereto;

4. Defendant Fariz's Motion to Strike Surplusage (Dkt.# 251) and the government's response (Dkt.# 340) thereto;

5. Defendant Fariz's Motion to Dismiss Count 1 of the Indictment (Dkt.# 255) and the government's response (Dkt.# 343) thereto;

6. Defendant Fariz's Motion to Strike as Surplusage as to Count 1, Paragraph 43, Subparagraphs (236), (240), (247), and (253) of the Indictment, and to Dismiss Counts 35, 37, 41, and 43 of the Indictment (Dkt.# 256) and the government's response (Dkt.# 340) thereto;

7. Defendant Al–Arian's Amended Motion to Dismiss Counts 1, 2, 3 and 4 of the Indictment (Dkt.# 273), the government's response (Dkt.# 346), and Al–Arian's reply (Dkt.# 425) thereto;

8. Defendant Fariz's Motion to Dismiss Counts 3 and 4 of the Indictment (Dkt.# 301) and the government's response (Dkt.# 345) thereto;

9. Defendant Fariz's Motion to Quash Section (b) of Paragraph 26 of the Indictment for Failure to State a Legal Basis for Relief (Dkt.# 302) and the government's response (Dkt.# 344) thereto;

10. Defendant Fariz's Request for Oral Argument on Defendant's Pretrial Motions (Dkt.# 303);

11. Defendant Hammoudeh's Motion to Dismiss Count 1 of the Indictment (Dkt.# 313) and the government's response (Dkt.# 343) thereto;

12. Defendant Hammoudeh's Amended Motion to Dismiss Count 1 of the Indictment (Dkt.# 330) and the government's response (Dkt.# 343) thereto;

13. Defendant Faiz's Motion for Reconsideration of Magistrate Judge's Order Denying in Part Fariz's Motion for Bill of Particulars (Dkt.# 440); and

14. Defendant Ballut's Motion for Reconsideration of Motion for Bill of Particulars (Dkt.# 441).

## I. BACKGROUND

### A. FACTUAL AND PROCEDURAL BACKGROUND

This is a criminal action against alleged members of the Palestinian Islamic Jihad–Shiqaqi Faction (the "PIJ") who purportedly operated and directed fundraising and other organizational activities in the United States for almost twenty years. The PIJ is a foreign organization that uses violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people. On February 19, 2003, the government indicted the Defendants[1] in a 50 count indictment that included counts for: (1) conspiracy to commit racketeering (Count 1); (2) conspiracy to commit murder, maim, or injure persons outside the United States (Count 2); (3) conspiracy to provide material support to or for the benefit of foreign terrorists (Counts 3 and 4); (4) violations of the Travel Act (Counts 5 through 44); (5) violation of the immigration laws of the United States (Counts 45 and 46); (6) obstruction of justice (Count 47);[2] and (7) perjury (Counts 48 through 50).[3]

Count 1 of the Indictment alleges a wide ranging pattern of racketeering activity beginning in 1984 lasting through February 2003, including murder, extortion, and money laundering.[4] The Indictment de-tails some 256 overt acts, ranging from soliciting and raising funds[5] to providing management, organizational, and logistical support for the PIJ. The overt act section of the Indictment details numerous suicide bombings and attacks by PIJ members causing the deaths of over 100 people, including 2 American citizens, and injuries to over 350 people, including 7 American citizens. These same overt acts (or parts of them) support the remaining counts of the Indictment.

Each of the Defendants filed numerous pretrial motions primarily seeking the dismissal of Counts 1 through 4 of the Indictment and the striking of various overt acts or parts of overt acts as surplusage.[6] The government opposed each motion. On January 21, 2004, this Court held oral argument. Additionally, Defendants Ballut and Fariz filed motions for reconsideration of the Magistrate's Order denying in part Defendants' motions for bill of particulars (Dkt.# 428).

### B. STATUTORY BACKGROUND

Center stage in the motions are two statutes (along with the regulations, administrative designations, and executive orders associated with each): (1) the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132 ("AEDPA"); and (2) the International Emergency Eco-

---

1. For purposes of this Order, this Court is only referring to Defendants Al–Arian, Hammoudeh, Ballut, and Fariz, when it uses the word "Defendants."

2. The obstruction of justice count is against defendants Al–Arian and Nafi.

3. The perjury counts are against Nafi alone for his testimony in the Immigration and Naturalization Service, Department of Justice matter styled *In the Matter of Mazen Al–Najjar.*

4. The remaining conspiracy counts (Counts 2 through 4) have slightly different durations and incorporate only part of the overt acts contained in Count 1.

5. An example of a soliciting or fundraising act is contained in Overt Act 130. In that overt act, the government claims that Defendant Al–Arian wrote a letter to a gentleman in Kuwait requesting additional money so that the PIJ could engage in more bombings and provide financial assistance to the families of recent suicide bombers who belonged to the PIJ.

6. Prior to and at the oral argument, each of the Defendants adopted the arguments raised by the other Defendants.

nomic Powers Act, 50 U.S.C. § 1701, *et seq.* ("IEEPA").

### 1. AEDPA

AEDPA authorizes the Secretary of State (the "Secretary"), in consultation with the Attorney General and the Secretary of the Treasury, to designate an organization as a Foreign Terrorist Organization ("FTO"). *See* 8 U.S.C. § 1189(a). Designation as a FTO has severe consequences to an organization, its members, and its supporters. For example, after designation, the Secretary of the Treasury may freeze all assets of a FTO in or controlled by a United States financial institution. *See* 8 U.S.C. § 1189(a)(2)(C). Additionally, representatives and certain members of FTOs may be barred from entry into the United States. *See id.* § 1182(a)(3)(B). More relevant to this case, the designation of an organization as a FTO has potential criminal ramifications on a FTO's supporters.[7] *See* 18 U.S.C. § 2339B(a)(1).

In passing AEDPA, Congress sought to prevent persons within the United States or subject to United States' jurisdiction from providing material support to foreign organizations engaged in terrorist activities "to the fullest possible basis, consis-tent with the Constitution." AEDPA, Pub.L. No. 104–132, § 301(b). Under Section 2339B(a)(1), a person who:

> knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and if the death of any person results, shall be imprisoned for any term of years or for life.

18 U.S.C. § 2339B(a)(1). The term "material support"[8] is broadly defined in AEDPA to mean "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials."[9] *Id.* § 2339A(b); *id.* § 2239B(g)(4). In passing such a broad prohibition, Congress found that FTOs "are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Pub.L. No. 104–132, § 301(a)(7).

In order to designate an organization a FTO under AEDPA, the Secretary must find that the: (a) organization is foreign; (b) organization engages in "terrorist ac-

---

**7.** Numerous other federal statutes potentially criminalize conduct related to or associated with terrorist groups. *See, e.g.,* 18 U.S.C. § 2332 (criminalizing a homicide of a U.S. national); *id.* § 2332a (outlawing use of weapons of mass destruction); *id.* § 2332b (criminalizing acts of terrorism transcending national boundaries); *id.* § 2332d (outlawing financial transactions with a foreign state supporting international terrorism); *id.* § 2332f (criminalizing the bombing of places of public use, government facilities, public transportation systems, and infrastructure facilities); *id.* § 2339 (outlawing the harboring or concealing of terrorists); *id.* § 2339A (criminalizing providing material support while intending to commit certain crimes); *id.* § 2339C (prohibiting providing or collect-ing funds with the intention that they be used in an act of terrorism).

**8.** The definition of "material support" was expanded by the Patriot Act to add "monetary instruments" and "expert advice or assistance." Pub.L. No. 107–56, § 805(a)(2).

**9.** According to the legislative history of AEDPA, the exclusions for medicine and religious materials are to be strictly construed. *See* H. Conf. Rep. No. 104–518, at 114 (1996), *reprinted in* 1996 U.S.C.C.A.N. 944, 947. As used in AEDPA, "medicine" is limited to medicine itself and not medical supplies. *See id.* Similarly, "religious materials" is limited to typical, customary, time honored articles of a religious faith or sect that cannot cause physical injury to a person. *See id.*

tivity,"[10] "terrorism,"[11] or has the capability and intent to engage in terrorist activity or terrorism; and (c) the terrorism or terrorist activity threatens either the security of United States nationals or national security. *See* 8 U.S.C. § 1189(a)(1). AEDPA provides no pre-designation notice to a potential FTO. *See id.* § 1189(a)(2)(A) (providing pre-designation notice by classified communication only to various congressional leaders). A designation takes effect upon publication. *See id.* § 1189(a)(2)(B)(i). A designation lasts for two years unless revoked by Congress or the Secretary. *See id.* §§ 1189(a)(2)(B)(ii), (a)(4)(A), (a)(5), (a)(6). The Secretary may renew a FTO designation every two years. *See id.* § 1189(a)(4)(B).

AEDPA limits the right, scope, basis and time period for judicial review by a FTO. *See id.* § 1189(b) (limiting judicial review to 30 days after designation based solely on the administrative record, unless the government wants to submit additional classified evidence *ex parte*, and limiting the scope of review that the United States

Court of Appeals for the District of Columbia Circuit takes of a designation). Further, AEDPA precludes a criminal defendant's right to "raise any question concerning the validity of the issuance of such designation as a defense or objection at any trial or hearing." *Id.* § 1189(a)(8).

On October 8, 1997, the Secretary designated PIJ as a FTO under AEDPA. *See* 62 Fed.Reg. 52,650 (1997).[12] The Secretary's designation of PIJ as a FTO was renewed in 1999, 2001, and 2003. *See* 64 Fed.Reg. 55,112 (1999); 66 Fed.Reg. 51,088 (2001); 68 Fed.Reg. 56,860 (2003). Neither Congress nor the Secretary revoked the PIJ's designation at any time, and the PIJ has not sought judicial review of its designations as a FTO.

## 2. IEEPA

The second statute central to these motions is IEEPA. Under IEEPA, the President is granted the authority "to deal with any unusual and extraordinary threat ... to the national security, foreign policy, or economy of the United States, if the Presi-

---

**10.** 8 U.S.C. § 1182(a)(3)(B)(iii) defines terrorist activity as:

> any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:
>
> (I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).
>
> (II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.
>
> (III) A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.
>
> (IV) An assassination.

> (V) The use of any—
> (a) biological agent, chemical agent, or nuclear weapon or device, or
> (b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain), with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.
>
> (VI) A threat, attempt, or conspiracy to do any of the foregoing.

**11.** Terrorism is defined as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." 22 U.S.C. § 2656f(d)(2).

**12.** The Secretary designated the "Palestine Islamic Jihad–Shaqaqi (sic) Faction also known as PIJ–Shaqaqi Faction, also known as PIJ, also known as Islamic Jihad in Palestine, also known as Islamic Jihad of Palestine, also known as Abu Ghunaym Squad of the Hizballah Bayt Al–Maqdis" as a FTO. *See id.*

dent declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). The President's authority includes the power to investigate, regulate, or prohibit financial transactions. *See id.* § 1702(a)(1). Section 1705(b) makes it unlawful to willfully violate or attempt to violate any executive order or regulation issued pursuant to IEEPA and provides for imprisonment of up to 10 years for such a violation. *See id.* § 1705(b).

On January 23, 1995, pursuant to IEEPA, President Clinton issued Executive Order 12947 (the "Executive Order"). *See* Exec. Order No. 12947, 60 Fed.Reg. 5079 (1995). The Executive Order declared a national emergency with respect to the Middle East peace process that threatened the United States' national security, for-

eign policy, and economy. *See id.* The Executive Order prohibited financial transactions with any specially designated terrorist ("SDT"). *See id.* The President also authorized the Secretary, in coordination with the Attorney General and Secretary of the Treasury, to promulgate regulations to carry out the Executive Order. *See id.* at 5079–80.[13] The annex to the Executive Order designates the PIJ as a SDT.[14] *See id.* at 5080.

The Secretary of the Treasury promulgated regulations that are contained in Title 31 C.F.R. part 595. Most relevant to this case, Section 595.204 makes it unlawful to "deal in property or interests in property[15] of a ... [SDT], including the making or receiving of any contribution of funds, goods, or services[16] to or for the

13. The Executive Order also delegated to the Secretary the ability to designate foreign persons SDTs, upon concluding that the person: (a) committed or posed a significant risk of committing acts of violence for the purpose or effect of disrupting the Middle East peace process; or (b) assisted, sponsored, or provided financial, material, or technological support or services in connection with such acts of violence. *See id.* at 5079. The Secretary of Treasury may also designate persons SDTs if they are owned or controlled by a SDT or act on behalf of a SDT. *See id.*

14. Fathi Shiqaqi, co-defendant Awda, and co-defendant Shallah were designated SDTs. *See* 60 F.R. 5084–01, 1995 WL 25636 (F.R.) (Jan. 25, 1995) (naming Shiqaqi and Awda); 60 F.R. 58435–03, 1995 WL 694334 (F.R.) (Nov. 27, 1995) (naming Shallah).

15. Section 595.310 broadly defines property and property interests to include, but not be limited to:

> money, checks, drafts, bullion, bank deposits, savings accounts, debts, indebtedness, obligations, notes, guarantees, debentures, stocks, bonds, coupons, any other financial instruments, bankers acceptances, mortgages, pledges, liens or other rights in the nature of security, warehouse receipts, bills of lading, trust receipts, bills of sale, any

other evidences of title, ownership or indebtedness, letters of credit and any documents relating to any rights or obligations thereunder, powers of attorney, goods, wares, merchandise, chattels, stocks on hand, ships, goods on ships, real estate mortgages, deeds of trust, vendors sales agreements, land contracts, leaseholds, ground rents, real estate and any other interest therein, options, negotiable instruments, trade acceptances, royalties, book accounts, accounts payable, judgments, patents, trademarks or copyrights, insurance policies, safe deposit boxes and their contents, annuities, pooling agreements, services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future or contingent.

31 C.F.R. § 595.310. The regulations define "interest," as in "interest in property," to mean "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 595.307.

16. Services is also broadly interpreted and includes legal, accounting, public relations, educational, or other services to a SDT. *See* 31 C.F.R. § 595.406. However, Sections 595.506 and 595.507 allow for legal and emergency medical services, including legal services to a SDT regarding its designation. *See id.* §§ 595.506, 595.507.

benefit of a[SDT] ...." 31 C.F.R. § 595.204 (footnotes added). The regulations interpret this prohibition to include charitable contributions or "donation[s] of funds, goods, services, or technology to relieve human suffering, such as food, clothing, or medicine." *Id.* § 595.408(a). The regulations interpret the prohibition against financial transactions to extend to conspiracies and attempts. *See id.* § 595.205.

Not all transactions with a SDT are banned or are criminal. For example, the regulations make clear that there is no liability for a charitable contribution if the contribution is made "without knowledge or reason to know that the donation or contribution is destined to or for the benefit of a[SDT] ...." *Id.* § 595.408(b). In addition, the regulations exempt certain transactions from the ban, including transactions that: (a) are licensed or authorized; (b) involve personal communications that do not transfer anything of value; (c) involve some types of information and informational materials; or (d) are incidental to travel. *See id.* §§ 595.101, 595.206, 595.501.

IEEPA itself does not explicitly or implicitly provide for judicial review of an executive order, but it does provide a procedure for court review of classified information. *See* 50 U.S.C. § 1702(c) (stating that "[t]his subsection does not confer or imply a right to judicial review"). The regulations provide a process for administrative review of a designation of an organization as an SDT. *See* 31 C.F.R. § 501.806 (mistaken identity); § 501.807 (removal of designation as an SDT). Courts have held that judicial review of a designation under IEEPA or its regulations exists and that the Administrative Procedures Act gov-

erns that review. *See, e.g., Holy Land Foundation for Relief and Development v. Ashcroft,* 333 F.3d 156 (D.C.Cir.2003), *cert. den.* —— U.S. ——, 124 S.Ct. 1506, 158 L.Ed.2d 153 (2004). There are no limitations on judicial review like those contained in AEDPA.

## II. DISCUSSION

Federal Rules of Criminal Procedure Rule 12(b) allows a defendant to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R.Crim. Proc. 12(b). Moreover, Rule 12(b)(3) of the Federal Rules of Criminal Procedure requires certain motions be made prior to trial including motions "alleging a defect in the indictment." Fed. R.Crim. Proc. 12(b)(3)(B).

 This Court may resolve a motion to dismiss in a criminal case when the "infirmity" in the indictment is a matter of law and not one of the relevant facts is disputed. *See United States v. Korn,* 557 F.2d 1089, 1090 (5th Cir.1977);[17] *United States v. Zayas–Morales,* 685 F.2d 1272, 1273 (11th Cir.1982) (concluding that it was appropriate for a district court to rule on a motion to dismiss when parties stipulated undisputed facts). As the Eleventh Circuit has commented, "[t]here is no summary judgment procedure for criminal cases" and no rule provides a pretrial determination of the sufficiency of the government's evidence. *United States v. Critzer,* 951 F.2d 306, 307 (11th Cir.1992) (per curiam). In deciding a motion to dismiss, this Court must deny the motion if the factual allegations of the indictment taken

---

**17.** In *Bonner v. City of Prichard,* the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit hand-

ed down prior to September 30, 1981. 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

in the light most favorable to the government are sufficient to charge an offense as a matter of law. *See United States v. deVegter,* 198 F.3d 1324, 1327 (11th Cir. 1999) (quoting *United States v. Torkington,* 812 F.2d 1347, 1354 (11th Cir.1987)).[18]

■■■ In addition, this Court may strike surplusage from an indictment. *See United States v. Huppert,* 917 F.2d 507, 511 (11th Cir.1990); *United States v. Awan,* 966 F.2d 1415, 1426 (11th Cir.1992). The standard for striking surplusage is "exacting." *Huppert,* 917 F.2d at 511. The standard requires it to be clear that the allegedly surplus language is irrelevant to the charge and is also inflammatory and prejudicial. *See id.* The Court may reserve ruling on a motion to strike surplusage until hearing the evidence and determining its relevance at trial. *See Awan,* 966 F.2d at 1426.

The motions pending before this Court can be segregated into three categories. First, Defendants' motions raise a host of statutory construction and constitutional issues purportedly on which this Court should dismiss or strike Counts 1 through 4 (or parts of Counts 1 through 4). Second, Defendants raise a variety of technical or procedural arguments to some of the Counts and acts contained in the Indictment. Third, Defendants Ballut and Fariz have appealed the Magistrate's order on the bill of particulars (Dkt.# 428). This Court will examine each category in turn.

### A. STATUTORY CONSTRUCTION AND CONSTITUTIONAL ISSUES

### 1. STATUTORY CONSTRUCTION OF AEDPA AND IEEPA

#### a. First Amendment, Overbreadth, and Vagueness Background

Before reaching the statutory construction issues, it is helpful, if not necessary, to understand certain constitutional arguments raised by the parties that affect this Court's construction of AEDPA and IEEPA. Defendants have moved to dismiss Counts 1 through 4 of the Indictment, arguing that the Indictment attempts to criminalize their First Amendment rights of speech in support of and association with the PIJ. Defendants assert that Counts 1 through 4 are unconstitutional because they do not require either: (a) a specific intent to further the unlawful activities of the PIJ; or (b) an intent to incite and a likelihood of imminent disorder.[19] Alternatively, Defendants argue that Counts I through 4 are not content neutral and are subject to analysis under strict scrutiny, which is rarely, if ever, met and is not met in this case.

As a corollary to their First Amendment argument, Defendants also claim that the doctrines of overbreadth and vagueness invalidate AEDPA or IEEPA in whole or in part. Defendants assert that the statutes sweep so broadly that they include substantial amounts of constitutionally protected advocacy within their prohibi-

---

18. *See also United States v. Covington,* 395 U.S. 57, 60, 89 S.Ct. 1559, 23 L.Ed.2d 94 (1969) (stating "[a] defense is capable of pretrial determination if trial of facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense"); *United States v. Ayarza–Garcia,* 819 F.2d 1043, 1048 (11th Cir.1987) (concluding a motion to dismiss does not allow a defendant to challenge the "truth of the allegations" contained in the indictment).

19. To support this argument, Defendants rely on a series of decisions involving the communist party and its members. *See, e.g., Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957); *Dennis v. United States,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).

tions. Similarly, Defendants argue that the material terms of each statute are so broadly defined that a person is incapable of knowing when otherwise protected activity becomes criminal. In support of Defendants' position, Defendants cite to two Ninth Circuit opinions where that court twice concluded that portions of AEDPA are unconstitutionally vague as applied to the plaintiffs in that case.[20] Defendants argue that the same hypothetical utilized by the Ninth Circuit indicates that other sections of AEDPA and IEEPA are similarly vague and unconstitutional.

The government responds that the Indictment alleges that Defendants engaged in criminal conduct and activities, not protected speech or association. The government asserts that the Indictment alleges that Defendants conspired with the PIJ and assisted the PIJ in the accomplishment of unlawful activities, including, but not limited to, murder, extortion, and money laundering. According to the government, speech is utilized in the Indictment to show Defendants' agreement to participate in the conspiracy, and their role, motive, and intent, all of which is allowable under the First Amendment. The government argues that AEDPA and IEEPA need not contain a specific intent to further unlawful activities or be limited to situations where a defendant intends to incite and a likelihood of imminent disorder, because the statutes and the Indictment are aimed at conduct and not speech or association. Similarly, the government

asserts that AEDPA and IEEPA need not meet strict scrutiny, but only need meet the intermediate scrutiny standard of *United States v. O'Brien*,[21] which is far easier to meet and, according to the government, is met by AEDPA and IEEPA. The government also cites to the Ninth Circuit's *Humanitarian* cases, where the Ninth Circuit twice applied this analysis and concluded that AEDPA did not violate the First Amendment rights of the plaintiffs in those cases.[22]

The government also opposes the Defendants' contentions that AEDPA and IEEPA are overbroad or vague. The government relies on the presence of "knowingly" or "willfully" *mens rea* requirements in the statutes to remove protected speech from the prohibited conduct covered under both statutes. Similarly, the government argues that the statutes in the vast number of applications cover only unprotected conduct and only in remote hypothetical situations do AEDPA and IEEPA even come close to impinging upon protected speech. The government cites to a line of Supreme Court cases, which have held in such circumstances that courts should not use the overbreadth and vagueness doctrines to invalidate statutes.

While it may not be apparent from either parties' arguments, the dispute between the parties on what analysis applies and the constitutionality of Counts 3 and 4 of the Indictment actually turns on how this Court interprets AEDPA and IEE-

---

**20.** *See Humanitarian Law Project v. United States Dep't of Justice,* 352 F.3d 382, 403–05 (9th Cir.2003) (hereinafter referred to as *"Humanitarian II"*); *Humanitarian Law Project v. Reno,* 205 F.3d 1130, 1137–38 (9th Cir.2000), *cert. den. sub nom., Humanitarian Law Project v. Ashcroft,* 532 U.S. 904, 121 S.Ct. 1226, 149 L.Ed.2d 136 (2001) (hereinafter referred to as *"Humanitarian I"*) (collectively *Humanitarian I* and *Humanitarian II* are referred to as *"Humanitarian "*).

**21.** 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Under the *O'Brien* standard, a court evaluates whether: (a) the regulation is within the government's power; (b) the regulation supports an important or substantial government interest; (c) the regulation is unrelated to suppression of speech; and (d) the restriction on speech is no greater than necessary. *See id.*

**22.** *Humanitarian II,* 352 F.3d at 385, 393; *Humanitarian I,* 205 F.3d at 1133–36.

PA. The broader this Court interprets AEDPA and IEEPA, the more likely that the statutes receive a higher standard of review and are unconstitutional. For example, if this Court interprets AEDPA and IEEPA as requiring a specific intent to further the illegal activities of the FTO or SDT, then no constitutional problems exist. Similarly, if this Court interprets AEDPA's and IEEPA's prohibitions broadly and does not impose a specific intent *mens rea* requirement, it will likely be forced to perform a vagueness analysis and find portions of AEDPA and IEEPA unconstitutional, as did the Ninth Circuit in the *Humanitarian* cases.

**b. Standards for interpreting a statute**

In interpreting statutes, the Court is to begin with the words of a statutory provision. *See Jackson v. State Bd. of Pardons and Paroles*, 331 F.3d 790, 794–95 (11th Cir.2003); *CBS, Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir.2001). If the plain meaning of a provision is unambiguous, then this Court's inquiry is usually complete. *See Jackson*, 331 F.3d at 794. Only when the plain meaning is ambiguous or causes absurd, unintended results is this Court's analysis incomplete. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69–70, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994); *CBS, Inc.*, 245 F.3d at 1222. If an ambiguity exists or an absurd result occurs, this Court is to resort to the cannons of statutory construction to determine the meaning of a statutory provision by focusing on the broader, statutory context. *See X-Citement Video, Inc.*, 513 U.S. at 70–78, 115 S.Ct. 464; *CBS, Inc.*, 245 F.3d at 1222.

Several cannons of statutory construction are useful in this case. First, courts are to interpret statutes in a manner that avoids constitutional difficulty.[23] *See X-Citement Video*, 513 U.S. at 78, 115 S.Ct. 464 (stating that it is "incumbent ... to read the statute to eliminate [constitutional] doubts so long as such a reading is not plainly contrary to the intent of Congress."); *Frisby v. Schultz*, 487 U.S. 474, 483, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (holding that lower courts run "afoul" of a well established principle of statutory interpretation when they fail to avoid constitutional difficulties and broadly interpret a statute).[24] Second, courts interpret criminal statutes to include broadly applicable *scienter* requirements. *See X-Citement Video*, 513 U.S. at 69, 115 S.Ct. 464.

In *X-Citement Video*, the Supreme Court faced almost the same statutory interpretation issues faced in this case. There, the Supreme Court considered the Protection of Children Against Sexual Exploitation Act, 18 U.S.C. § 2252. 513 U.S. at 65–66, 115 S.Ct. 464. Section 2252 of that Act made it unlawful for any person to "knowingly" transport, ship, receive, distribute, or reproduce a visual depiction involving a "minor engaging in sexually explicit conduct." *Id.* at 68, 115 S.Ct. 464. The Ninth Circuit had interpreted "knowingly" to only modify the surrounding verbs, like transport or ship. *See id.* Under this construction, whether a defendant knew the minority of the performer(s) or even knew whether the material was sexually explicit was inconsequential. *See id.* at 68–69, 115 S.Ct. 464. The Supreme

---

**23.** Indeed, this cannon of statutory construction is explicitly embedded in the purposes section of AEDPA. In passing AEDPA, Congress sought to prevent persons within the United States or subject to United States' jurisdiction from providing material support to foreign organizations engaged in terrorist activities "to the fullest possible basis, consis-

tent with the Constitution." AEDPA, Pub.L. No. 104–132, § 301(b).

**24.** *See also Cable Holdings of Georgia, Inc. v. McNeil Real Estate Fund VI, Ltd.*, 953 F.2d 600, 604 (11th Cir.1992); *United States v. Brown*, 731 F.2d 1491, 1494 (11th Cir.1984).

Court reversed, concluding that, while the Ninth Circuit's construction of Section 2252 complied with the plain meaning rule, the construction caused absurd results. *See id.* at 69, 115 S.Ct. 464. Under the Ninth Circuit's construction, the Court noted that a Federal Express courier who knew that there was film in a package could be convicted even though the courier had no knowledge that the film contained child pornography. *See id.* To avoid such results, the Court utilized the cannons of statutory construction to imply a "knowing" requirement to each element, including the age of the performers and the sexually explicit nature of the material. *See id.* at 70–78, 115 S.Ct. 464. The Court stated that in criminal statutes "the presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct." *Id.* at 72, 115 S.Ct. 464.

#### c. Statutory Construction of AEDPA

■ Turning now to AEDPA, Section 2339B(a)(1) makes it unlawful for a person to "knowingly provide[ ] material support or resources [25] to a foreign terrorist organization, or attempts or conspires to do so ...." 18 U.S.C. § 2339B(a)(1) (footnote added). The Ninth Circuit has twice in a single case interpreted Section 2339B and found portions to be unconstitutionally vague as applied to the plaintiffs in that case. *See Humanitarian II*, 352 F.3d at 385, 393; *Humanitarian I*, 205 F.3d at

1133–36. *Humanitarian* involved a civil action for declaratory and injunctive relief brought by six organizations and two United States citizens who wished to provide the Kurdistan Workers' Party (the "PKK") and the Liberation Tigers of Tamil Eelam (the "LTTE") with support for the political and nonviolent humanitarian activities of each organization. *See* 205 F.3d at 1133.[26]

In *Humanitarian I*, the Ninth Circuit faced head on a challenge to Section 2339B on freedom of association, freedom of speech, and vagueness grounds. *See id.* at 1133–38. The Ninth Circuit affirmed the district court's determination that AEDPA did not impinge upon the plaintiffs' associational or speech rights. *See id.* at 133–36. However, the Ninth Circuit also affirmed the district court's determination that the terms "personnel" and "training" (specified elements of "material support") were unconstitutionally vague because those terms could impinge on a person's advocacy rights. *See id.* at 1137–38. The Ninth Circuit commented that:

> Someone who advocates the cause of PKK could be seen as supplying them with personnel; it even fits under the government's rubric of freeing up resources, since having an independent advocate frees up members to engage in terrorist activities instead of advocacy. But advocacy is pure speech protected by the First Amendment.

*Id.* at 1137.[27]

---

**25.** The term "material support or resources" is defined in AEDPA to mean "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." *Id.* § 2339A(b); *id.* § 2239B(g)(4).

**26.** In *Humanitarian I,* the Ninth Circuit faced a cross-appeal of a motion for preliminary injunction, which the district court granted in

part and denied in part. 205 F.3d at 1133. In *Humanitarian II*, the Ninth Circuit again faced a cross-appeal of motions for summary judgment and permanent injunction, which the district court granted in part and denied in part. 352 F.3d at 385.

**27.** The *Humanitarian II* panel provided an illustration of how an advocate could free up members to engage in terrorism. *See* 352 F.3d at 404. The Ninth Circuit stated that "personnel" could include "efforts to urge members of Congress to support the release of kurdish political prisoners in Turkey." *Id.*

Similarly, the Ninth Circuit stated that training was also vague because it could include "a plaintiff who wishes to instruct members of a designated group on how to petition the United Nations to give aid to their group ...." *Id.* at 1138. The government "invite[d]" the Ninth Circuit to cure these vagueness problems by implying "knowingly," which occurs earlier in the statute, to the material support requirement. The Ninth Circuit rejected this construction, reasoning that such a construction would be judicially rewriting the statute. *See id.* at 1138. The Ninth Circuit construed "knowingly" as modifying only "provides," which meant that the scienter requirement was met when the accused had knowledge that he provided something, rather than "knowledge ... that what is provided in fact constitutes material support." *See id.* at 1138 n. 5.

On subsequent appeal in *Humanitarian II,* the Ninth Circuit reaffirmed its prior rulings on the plaintiffs' First Amendment arguments. 352 F.3d at 385, 393. However, the *Humanitarian II* panel faced a new Fifth Amendment challenge by the plaintiffs, who argued that the lack of personal guilt requirement in Section 2339B rendered it unconstitutional. *See id.* at 385. Therefore, the Ninth Circuit reconsidered its interpretation of the *mens rea* requirement in *Humanitarian I. See id.* Under its new interpretation, the Ninth Circuit concluded that Section 2339B also required proof that a person either knew: (a) that an organization was a FTO; or (b) of an organization's unlawful activities that caused it to be designated as a FTO. *See id.* at 400. The Ninth Circuit then reaffirmed its prior holding on the vagueness of "personnel" and "training" without analyzing how the change in the *mens rea*

requirement affected its prior vagueness analysis. *See id.* at 403–05.

This Court agrees with the Ninth Circuit in *Humanitarian I* that a purely grammatical reading of the plain language of Section 2339B(a)(1) makes it unlawful for any person to knowingly furnish any item contained in the material support categories to an organization that has been designated a FTO. And like *Humanitarian II,* this Court agrees that this construction renders odd results and raises serious constitutional concerns. For example under *Humanitarian I,* a donor could be convicted for giving money to a FTO without knowledge that an organization was a FTO or that it committed unlawful activities, and without an intent that the money be used to commit future unlawful activities.[28]

*Humanitarian II* attempted to correct this odd result and accompanying constitutional concerns by interpreting "knowingly" to mean that a person knew: (a) an organization was a FTO; or (b) an organization committed unlawful activities, which caused it to be designated a FTO. *See* 352 F.3d at 400. But, *Humanitarian II* 's construction of Section 2339B only cures some of the Fifth Amendment concerns. First, *Humanitarian II* fails to comply with *X-Citement Video* 's holding that a *mens rea* requirement "should apply to each of the statutory elements that criminalize otherwise innocent conduct." 513 U.S. at 72, 115 S.Ct. 464. *Humanitarian II* implies only a *mens rea* requirement to the FTO element of Section 2339B(a)(1) and not to the material support element. Under *Humanitarian II* 's construction, a cab driver could be guilty for giving a ride to a FTO member to the UN, if he knows that the person is a member of a FTO or the

**28.** Similarly, a bank teller who cashes the donor's check for a FTO could also be guilty

despite a similar lack of knowledge.

member or his organization at sometime conducted an unlawful activity in a foreign country. Similarly, a hotel clerk in New York could be committing a crime by providing lodging to that same FTO member under similar circumstances as the cab driver. Because the *Humanitarian II*'s construction fails to avoid potential Fifth Amendment concerns, this Court rejects its construction of Section 2339B.

Second, the *Humanitarian II* construction does not solve the constitutional vagueness concerns of Section 2339B(a)(1),[29] which can be avoided by implying a *mens rea* requirement to the "material support or resources" element of Section 2339(B)(a)(1). If this Court accepted the *Humanitarian II* construction, it would likely have to declare many more categories of "material support" (in addition to "training" and "personnel" determined to be unconstitutionally vague in the *Humanitarian* cases) unconstitutionally vague for impinging on advocacy rights, including "financial services," "lodging," "safe houses," "communications equipment," "facilities," "transportation" and "other physical assets." Using the Ninth Circuit's vagueness example on "train-

ing,"[30] the statute could likewise punish other innocent conduct, such as where a person in New York City (where the United Nations is located) gave a FTO member a ride from the airport to the United Nations before the member petitioned the United Nations. Such conduct could be punished as providing "transportation" to a FTO under Section 2339B.[31] The end result of the Ninth Circuit's statutory construction in *Humanitarian II* is to render a substantial portion of Section 2339B unconstitutionally vague.

But, it is not necessary to do such serious damage to the statute if one follows the analysis used by the United States Supreme Court in *X–Citement Video*.[32] This Court concludes that it is more consistent with Congress's intent, which was to prohibit material support from FTOs to the "fullest possible basis," to imply a *mens rea* requirement to the "material support" element of Section 2339B(a)(1). Therefore, this Court concludes that to convict a defendant under Section 2339B(a)(1) the government must prove beyond a reasonable doubt that the defendant knew that: (a) the organization was a FTO or had committed unlawful activities

**29.** The government quotes *Hill v. Colorado*, 530 U.S. 703, 733, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000), for the proposition that this Court should not use hypothetical situations to support a vagueness attack on Section 2339B. However, the quote on which the government relies is dicta. Moreover, it occurs in the opinion right after the Supreme Court determined that the statute was not vague because the statute at issue contained a knowingly *mens rea* requirement. *See* 530 U.S. at 732, 120 S.Ct. 2480.

**30.** The Ninth Circuit utilized the example of "a plaintiff who wishes to instruct members of a designated group on how to petition the United Nations to give aid to their group ...." *Humanitarian I*, 205 F.3d at 1138.

**31.** Other examples of innocent conduct that could be prohibited include the same person

allowing the FTO member to spend the night at his house, cashing a check, loaning the member a cell phone for use during the stay, or allowing the member to use the fax machine or laptop computer in preparing the petition. And, the additional phrase "expert advice or assistance" added by the Patriot Act in 2002 could also fail as unconstitutionally vague. *See, e.g., Humanitarian Law Project v. Ashcroft*, 2004 WL 112760, at *12–14 (C.D.Cal. Jan.22, 2004) (holding that "expert advice or assistance" added by the Patriot Act to definition of "material support" was unconstitutionally vague).

**32.** The Supreme Court has repeatedly recognized that a *scienter* or *mens rea* requirement may mitigate a law's vagueness. *See, e.g., Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 526, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994).

that caused it to be so designated; and (b) what he was furnishing was "material support." To avoid Fifth Amendment personal guilt problems, this Court concludes that the government must show more than a defendant knew something was within a category of "material support" in order to meet (b). In order to meet (b), the government must show that the defendant knew (had a specific intent) that the support would further the illegal activities of a FTO.[33]

This Court does not believe this burden is that great in the typical case.[34] Often, such an intent will be easily inferred. For example, a jury could infer a specific intent to further the illegal activities of a FTO when a defendant knowingly provides weapons, explosives, or lethal substances to an organization that he knows is a FTO because of the nature of the support. Likewise, a jury could infer a specific intent when a defendant knows that the organization continues to commit illegal acts and the defendant provides funds to that organization knowing that money is fungible and, once received, the donee can use the funds for any purpose it chooses. That is, by its nature, money carries an inherent danger for furthering the illegal aims of an organization. Congress said as much when it found that FTOs were "so

tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Pub.L. No. 104–132, § 301(a)(7).

This opinion in no way creates a safe harbor for terrorists or their supporters to try and avoid prosecution through utilization of shell "charitable organizations" or by directing money through the memo line of a check towards lawful activities.[35] This Court believes that a jury can quickly peer through such facades when appropriate. This is especially true if other facts indicate a defendant's true intent, like where defendants or conspirators utilize codes or unusual transaction practices to transfer funds. Instead, this Court's holding works to avoid potential constitutional problems and fully accomplish congressional intent.

### d. Construction of IEEPA, the Executive Order, and the Regulations

■ Section 1705(b) makes it unlawful to "willfully" violate or attempt to violate any regulation or order issued pursuant to IEEPA. 50 U.S.C. § 1705(b). Pursuant to IEEPA, the President issued the Executive Order, and the Executive Order prohibits financial transactions with any SDT. *See* Exec. Order No. 12947, 60 Fed.Reg. 5079 (1995). Pursuant to the Executive Order, the Secretary of the Treasury pro-

---

**33.** This Court's conclusion is consistent with the Seventh Circuit's decision in *Boim v. Quranic Literacy Institute and Holy Land Foundation for Relief and Development*, 291 F.3d 1000 (7th Cir.2002). In *Boim*, the Seventh Circuit considered whether a violation of Section 2339B could serve as a basis for civil liability under Section 2333. The Seventh Circuit held that to succeed on a Section 2333 claim, plaintiff must prove that the defendant knew about the unlawful activities of the FTO and intended to help in those unlawful activities. *See id.* at 1023–24. This Court's construction of Section 2339B avoids the anomaly of civil liability being more narrow than criminal liability based on the same statutory language.

**34.** Indeed, Congress recently added 18 U.S.C. § 2339C, which criminalized raising funds with the specific intent that the funds will be or are used to cause the death or serious bodily injury of a civilian with the purpose of intimidating the population or compelling a government to do or abstain from doing any act. *See* 18 U.S.C. § 2339C.

**35.** For example, a donation to a suicide bomber's family given with the intent to encourage others to engage in such activities or support such activities would satisfy this specific intent requirement.

mulgated regulations. Section 595.204 of those regulations makes it unlawful to "deal in property or interests in property of a ... [SDT], including the making or receiving of any contribution of funds, goods, or services [36] to or for the benefit of a[SDT] ...." 31 C.F.R. § 595.204 (footnote added). The regulations further interpret this prohibition as including some charitable contributions. *See id.* § 595.408.

While no court has construed the criminal prohibition contained in IEEPA, this Court concludes that a conviction under IEEPA in these circumstances requires similar proof of intent similar to that required under AEDPA. In other words, this Court concludes that to criminally convict a defendant for violating IEEPA the government must prove a defendant: (a) knew either that an organization was a SDT or committed unlawful activities that caused it to be designated as a SDT; and (b) had a specific intent that the contribution be used to further the unlawful activities of the SDT.[37]

This Court's conclusion is based on the plain language of Section 1705(b), which criminalizes only "willfully" committed violations of the Executive Order and the regulations interpreting the Executive Order. The Supreme Court has interpreted "willfully" in criminal statutes to "differentiate between deliberate and unwitting conduct" and means an act "undertaken with a 'bad purpose.'" *Bryan v. United States,* 524 U.S. 184, 191, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998). In *Bryan,* the

Supreme Court approved of a jury instruction that defined "willfully" as:

.... intentionally and purposely and with intent to do something the law forbids, that is, with the bad purpose to disregard the law. Now, the person need not be aware of the specific law or rule that his conduct may be violating. But he must act to do something that the law forbids.

*Id.* at 190, 199, 118 S.Ct. 1939. While knowledge of IEEPA, the Executive Order, or the regulations thereunder is not necessary to support a conviction, some "bad purpose" must be demonstrated by the government. This Court concludes that a "bad purpose" cannot be demonstrated by proof of knowledge of past unlawful activity alone. The government must show some additional intent to further future unlawful activity to support criminal liability.

This Court's interpretation of Section 1705(b) is not contrary to the intent of the Executive Order or its regulations. First, IEEPA contains a separate civil penalty provision that penalizes violations that are not willful. *See* 50 U.S.C. § 1705(a). It makes sense that the regulations punish some unlawful transactions by a civil penalty only, while punishing worse transgressions both civilly and criminally. Second, the regulations themselves contain an exception for charitable contributions, if the contribution is made without knowledge or reason to know that it was made to or for the benefit of a SDT. *See id.* § 595.408(b).

---

**36.** Services is also broadly interpreted and includes legal, accounting, public relations, educational, or other services to a specially designated terrorist. *See* 31 C.F.R. § 595.406. However, Sections 595.506 and 595.507 allow for legal and emergency medical services, including legal services to a SDT regarding its designation. *See id.* §§ 595.506, 595.507.

**37.** While Defendants only raise the PIJ in their arguments about the constitutionality of IEEPA, under the Executive Order and the regulations, a person can also be designated a SDT. While the government's burden should not differ whether a defendant contributes to an organization or individual, this Court believes that often it will be far easier to show a specific intent to further unlawful activities when an individual is the SDT.

Such an exception reinforces this Court's interpretation of a requirement of proof of a specific intent because it shows that the administering agency interprets the prohibition to not reach purely innocent or unwitting conduct.

Finally, this Court is concerned that without such a *scienter* requirement the prohibitions in the Executive Order may be unconstitutionally vague [38] or violate the Fifth Amendment's requirement of personal guilt. By requiring a specific intent to further the illegal activities of the SDT, this Court avoids considering whether the regulations are unconstitutionally vague or violate the Fifth Amendment's requirement of personal guilt.

### e. Judicial Review

■ Before reaching the constitutional issues, this Court has one additional statutory construction issue to determine: whether 8 U.S.C. § 1189(a)(8) precludes judicial review of a constitutional challenge to AEDPA.[39] Section 1189(a)(8) provides that a criminal defendant may not "raise any question concerning the validity of the issuance of such designation as a defense or objection at any trial or hearing." 8 U.S.C. § 1189(a)(8). Defendants argue that Section 1189(a)(8) only precludes review of the Secretary's designation of an organization as a FTO and not a criminal defendant's ability to raise a constitutional challenge. This Court agrees.

In addition to the general rules of statutory construction discussed above, the Supreme Court requires a clear and convincing showing of congressional intent before a court construes a statute to prohibit judicial review because of the serious constitutional concerns that such a prohibition causes. *See Johnson v. Robison*, 415 U.S.

361, 366–74, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). In *Johnson*, the Court considered a similar clause to the one in this case which was contained in the Veteran's Readjustment Act and concluded that the clause prohibited judicial review of a veteran's benefit claim under the act, but not judicial review of a veteran's claim that the act itself was unconstitutional. *See id.* at 373–74, 94 S.Ct. 1160.

The most natural reading of Section 1189(a)(8) prohibits a criminal defendant from challenging the designation of an organization as a FTO, but does not prohibit a criminal defendant from challenging AEDPA's constitutionality. Neither the language, the structure, nor the legislative history of AEDPA suggests that Congress intended to preclude a criminal defendant from asserting that AEDPA is unconstitutional. Moreover, this Court's construction of Section 1189(a)(8) is reinforced by the Supreme Court's decision and construction of a similarly worded clause in *Johnson*. Therefore, this Court concludes that this Court may review the constitutionality of AEDPA.

### 2. FIRST AMENDMENT

Given this Court's construction of the *mens rea* requirements of AEDPA and IEEPA, little remains to be said of Defendants' First Amendment challenges to Counts 3 and 4. This Court will address two points raised by Defendants as to the Indictment in general.

■ First, this Court agrees with the government that the Indictment does not criminalize "pure speech." Instead, the overt acts section of the Indictment utilizes the speech of Defendants to show the existence of the conspiracies, the Defendants'

---

38. The regulations interpret the prohibition on transactions to include contributions of "goods and services." The word "goods" is undefined, and "services" is broadly defined. Such words, without a *scienter* requirement, could easily include protected expression in the same way that AEDPA could.

39. No such clause exists in either IEEPA or any other statute cited in the Indictment.

agreement to participate in them, their level of participation or role in them, and the Defendants' criminal intent. It is well established that the government can use speech to prove elements of crimes such as motive or intent. *See Wisconsin v. Mitchell,* 508 U.S. 476, 489, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993); *United States v. Stewart,* 65 F.3d 918, 930 (11th Cir.1995).[40] As Associate Justice Jackson eloquently stated concurring in *Dennis v. United States:*

> The defense of freedom of speech or press has often been raised in conspiracy cases, because, whether committed by Communists, by businessmen, or by common criminals, it usually consists of words written or spoken, evidenced by letters, conversations, speeches or documents. Communication is the essence of every conspiracy, for only by it can common purpose and concert of action be brought about or be proved.... "But it has never been deemed an abridgement of freedom of speech ... merely because the conduct was in part initiated, evidenced, or carried out by means of language .... Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements ... and conspiracies deemed injurious to society."

341 U.S. 494, 575–76, 71 S.Ct. 857, 95 L.Ed. 1137 (1951) (quoting *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 498, 69 S.Ct. 684, 93 L.Ed. 834 (1949)) (Jackson, J., concurring).

Such words are equally applicable to the conspiracies charged in this case. The fact that Defendants' speech is contained in the overt act section of the Indictment is of little consequence. As the Eleventh Circuit stated in *United States v. Lanier,* "an overt act need not be criminal, and may indeed be otherwise innocent ...." 920 F.2d 887, 893 (11th Cir.1991); *see also Yates v. United States,* 354 U.S. 298, 334, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957) (holding same). In support of that proposition, the Eleventh Circuit cited to and relied on a Seventh Circuit case that held constitutionally protected speech can constitute an overt act. *See id.* at 893 n. 48, 77 S.Ct. 1064 (citing to *United States v. Donner,* 497 F.2d 184, 192 (7th Cir.1974)). The reason that an overt act can include even protected speech is that it is the agreement that is punishable in a conspiracy charge and not the overt act itself. Therefore, this Court denies Defendants' motion to dismiss on "pure speech" grounds.

Second, this Court declines Defendants' invitation to heighten the level of First Amendment protection given to seeking and donating funds. The Supreme Court has repeatedly considered the issue and determined that such activities are more like expressive conduct than pure speech. *See, e.g., McConnell v. Fed'l Election Comm'n,* —— U.S. ——, 124 S.Ct. 619, 654–56, 157 L.Ed.2d 491 (2003); *Nixon v. Shrink Missouri Gov't PAC,* 528 U.S. 377, 386–88, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000); *Buckley v. Valeo,* 424 U.S. 1, 20–21, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

■ This Court agrees with the Seventh Circuit in *Boim v. Quranic Literacy Institute and Holy Land Foundation for Relief and Development* that the *Buckley* standard applies to determine the constitutionality of a regulation prohibiting contributions to foreign organizations.[41] 291 F.3d

---

**40.** *See also Planned Parenthood of Columbia/Willamette, Inc.,* 290 F.3d 1058, 1083 (9th Cir.2002); *United States v. Rahman,* 189 F.3d 88, 117–18 (2d Cir.1999); *United States v. Salameh,* 152 F.3d 88, 111–12 (2d Cir.1998); *Rice v. Paladin Enterprises, Inc.,* 128 F.3d 233, 243–44 (4th Cir.1997).

**41.** This Court disagrees with the Ninth Circuit that intermediate scrutiny under *United States v. O'Brien* applies to whether a prohibition on fundraising and contribution is constitutional under the First Amendment. *See Humanitarian I,* 205 F.3d at 1134–35. The Ninth Circuit

1000, 1026–27 (7th Cir.2002). In *Boim*, the plaintiffs claimed defendant was liable to them under 18 U.S.C. § 2333 because the defendant violated Section 2339B. *See id.* at 1027. Section 2333 provided a civil remedy to U.S. nationals injured by acts of international terrorism. *See id.* The defendant challenged Section 2333 and 2339B's constitutionality on First Amendment grounds. *See id.* at 1026–27. The Seventh Circuit held that *Buckley*'s contribution analysis applied and concluded that Section 2333 (based on a violation of Section 2339B) did not violate the First Amendment. *See id.* The Seventh Circuit reasoned that *Buckley* applied because both speech and association components are implicated by regulations that restrict or prohibit a person's ability to contribute or fundraise on behalf of an organization.[42]

Under *Buckley* and its progeny, a regulation of fundraising is constitutional if it is closely drawn to further a sufficiently important government interest. *See McConnell*, —— U.S. at ——, 124 S.Ct. at 654–56; *Shrink Missouri Gov't PAC*, 528 U.S. at 387–88, 120 S.Ct. 897; *Buckley*, 424 U.S. at 30, 96 S.Ct. 612. This Court concludes that AEDPA, IEEPA, and the other statutes at issue in this case easily meet this analysis.[43]

■■■ The Supreme Court has termed the protection of the foreign policy inter-ests of the United States to be of great importance. *See, e.g., Haig v. Agee*, 453 U.S. 280, 307, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981). Likewise, other courts have concluded that the government's interest in stopping the spread of global terrorism is "paramount" or "substantial." *Boim*, 291 F.3d at 1027; *Humanitarian I*, 205 F.3d at 1135. This Court agrees and would conclude that stopping the spread of terrorism is not just a sufficiently important governmental interest, but is a compelling governmental interest.

Similarly, a congressional decision to stop the spread of global terrorism by preventing fundraising and prohibiting support is closely drawn to further this interest. This Court's construction of AEDPA and IEEPA (requiring proof of a specific intent to further the unlawful activities of a SDT or FTO) reinforces this Court's conclusion that the prohibitions in AEDPA and IEEPA are closely drawn to further the governmental interest. Therefore, this Court denies Defendants' motion to dismiss on First Amendment grounds.

## 3. PROCEDURAL DUE PROCESS: PIJ'S FTO DESIGNATION UNDER AEDPA AND SDT DESIGNATION UNDER IEEPA

■■■ Defendants argue that Counts 3 and 4 of the Indictment should be dismissed because the PIJ[44] was denied due

opinion provides no reason on why *Buckley*'s contribution analysis should not apply to other forms of contributions. This Court sees no basis for a difference in constitutional analysis between political contributions and other forms of contributions. Both have a speech and an associational component. However, as a practical matter, it may be easier for the government to regulate contributions to foreign groups because of the strength of the governmental interests at stake in cases similar to this one.

42. The government's reliance on *Wise Enterprises, Inc. v. Unified Govt. of Athens–Clarke County, Georgia* is misplaced. 217 F.3d 1360 (11th Cir.2000). *Wise Enterprise* involved regulation of adult establishments and not regulation of contributions to organizations.

43. As to Counts 1 and 2, this Court concludes that the government has sufficiently important governmental interests in preventing criminal conduct like that alleged in Counts 1 and 2 (activities like murder, maiming, injuring persons, extortion, and money laundering) and that both statutes are closely drawn to further that interest.

44. While not specifically mentioned in the motion, this Court assumes that Defendants also argue that Fathi Shiqaqi, co-defendant Awda, and co-defendant Shallah were denied due process when they were designated SDTs.

process under AEDPA and IEEPA when it was designated, respectively, a FTO and a SDT. Defendants rely primarily on the Supreme Court's opinion in *United States v. Mendoza–Lopez*,[45] and a district court decision in the United States District Court for the Central District of California, *United States v. Rahmani*,[46] in support of their argument. The government argues that *Mendoza–Lopez* is inapplicable to this case because these Defendants lack standing to challenge the PIJs designation and that *Rahmani* is seriously flawed. This Court concludes for those and additional reasons Defendants may not collaterally attack the designations of the PIJ under AEDPA or IEEPA.

In *Mendoza–Lopez*, the Supreme Court broadly held that "[o]ur cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding." 481 U.S. at 837–38, 107 S.Ct. 2148 (emphasis in original). The Court continued that where defects in the original proceeding foreclosed judicial review, collateral attack of a prior administrative decision in a subsequent criminal proceeding was allowable. *See id.* at 838–42, 107 S.Ct. 2148. *Mendoza–Lopez* involved a criminal prosecution for illegal re-entry in

which the defendant had been deprived of his right to appeal in the underlying deportation proceeding.[47] *See id.* at 842, 107 S.Ct. 2148. The Court affirmed the dismissal of an indictment and concluded that in such circumstances a prior deportation determination could not be used in a subsequent criminal proceeding. *See id.* In reaching its decision in *Mendoza–Lopez*, the Court distinguished two of its prior cases, *Yakus v. United States* [48] and *Lewis v. United States*,[49] which provide this Court with additional guidance in this case.

In *Yakus*, the Supreme Court dealt with the conviction of three defendants for violating the Emergency Price Control Act (the "EPCA") by selling beef at prices above the maximum prices allowable under a regulation. 321 U.S. at 418–19, 64 S.Ct. 660. The EPCA delegated to a price administrator the authority to make regulations setting maximum prices of certain goods. *See id.* at 423, 64 S.Ct. 660. The EPCA required someone challenging a regulation to seek administrative review within 60 days.[50] The EPCA limited judicial review of that administrative review to a specially established court, with a short statute of limitations period (30 days). *See id.* at 428–29, 64 S.Ct. 660. The EPCA allowed criminal liability to attach prior to the expiration of the time periods for administrative review or judicial determina-

**45.** 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987).

**46.** 209 F.Supp.2d 1045 (C.D.Cal.2002). The district court in *Rahmani* dismissed an indictment charging a violation of AEDPA based on a denial of due process to an FTO in its designation. *See id.* at 1058–59. The Court held AEDPA's designation procedure was facially unconstitutional. *See id.*

**47.** The government stipulated that the defendant received a fundamentally unfair deportation hearing. *See* 481 U.S. at 839–40, 107 S.Ct. 2148.

**48.** 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). The Court in *Mendoza–Lopez* distinguished *Yakus* on the grounds that *Yakus* involved the "exigencies of wartime," dealt with regulations and not an adjudication, and adequate judicial review was available in another forum. 481 U.S. at 838 n. 15, 107 S.Ct. 2148.

**49.** 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980).

**50.** The administrator would decide any appeal within thirty days. The objecting party could submit evidence along with its objection. There was no guaranty that the administrator would hold a hearing.

tion. *See id.* at 438–39, 64 S.Ct. 660. The Court concluded that the EPCA did not violate the defendant's due process rights by not allowing a defendant to challenge the regulation in a criminal prosecution because the defendants had the right to challenge the designation elsewhere. *See id.* at 447, 64 S.Ct. 660.

In *Lewis,* the Supreme Court dealt with whether a defendant could challenge the constitutionality of a prior felony conviction in a subsequent federal prosecution for possession of a firearm. 445 U.S. at 57–58, 100 S.Ct. 915. The Court held that it was constitutional to not allow a defendant to challenge a prior felony conviction in a subsequent federal prosecution because the defendant could challenge the validity of the conviction in another proceeding or otherwise seek removal of the disability before obtaining a firearm. *See id.* at 65–67, 100 S.Ct. 915.

Neither *Mendoza–Lopez, Yakus,* nor *Lewis* is exactly apposite to the case at hand. However, this Court concludes that this case is closer to *Yakus* and *Lewis* than *Mendoza–Lopez.*[51] Unlike *Mendoza–Lopez* and like *Yakus,* AEDPA and IEE-PA are measures taken to protect the national security of the United States. Similar to *Yakus* and *Lewis,* under either AEDPA or IEEPA, a designated organization can seek some judicial review of its designation.[52] Additionally, like in the *Humanitarian* cases, Defendants could

have challenged AEDPA and IEEPA in a civil action. In such circumstances, this Court concludes that Defendants, like the defendants in *Yakus* and *Lewis,* cannot collaterally challenge the designation procedure utilized to designate the PIJ.

Additionally, a FTO designation is a designation of a third-party and not a designation of Defendants themselves. This Court views that distinction as a critical distinction to the cases under *Mendoza–Lopez.* Except in rare cases, third parties do not have standing to assert the legal rights or interests of others. *See Campbell v. Louisiana,* 523 U.S. 392, 397–98, 118 S.Ct. 1419, 140 L.Ed.2d 551 (1998); *Powers v. Ohio,* 499 U.S. 400, 410–11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Warth v. Seldin,* 422 U.S. 490, 498–501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The limited exception to this general rule occurs only when: (1) a defendant suffers an injury-in-fact; (2) a defendant had a "close relationship" to the third party such that the two share a common interest; and (3) there is some hindrance to the third party's assertion of its rights. *Powers,* 499 U.S. at 411, 111 S.Ct. 1364.

This Court concludes that the PIJ has suffered no disincentive to assert its rights, like the jurors in *Campbell* and *Powers,* and third party standing does not exist in this case. Indeed, the PIJ had every incentive to assert any due process rights that it might possess, so that it

---

**51.** Even if *Mendoza–Lopez* applied to this case, Defendants have failed to make the showing required under *United States v. Holland,* 876 F.2d 1533, 1536 (11th Cir.1989). *See also Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (defining the prejudice that must be shown for a due process violation as but for the violation the result of the proceeding would have been different). Defendants have not shown that the outcome of the PIJ's designation might have been affected if the PIJ had every bit of judicial review to which Defendants' claim that the PIJ was entitled. *See*

*Holland,* 876 F.2d at 1536; *also Rahmani,* 209 F.Supp.2d at 1055 (denying *Mendoza–Lopez* challenge under AEDPA because the defendant could not demonstrate that the outcome would have been different). As such, the Defendants' motions to dismiss are denied.

**52.** IEEPA or the regulations promulgated pursuant to IEEPA do not contain any of the limitations on judicial review present in AEDPA, except that the government is authorized to submit *ex parte* classified information.

could resume fundraising and other activities in the United States. The existence of this incentive is demonstrated by the numerous groups that have challenged their designations under AEDPA. *See, e.g., United States v. Sattar*, 272 F.Supp.2d 348, 364 (S.D.N.Y.2003) (containing a list of cases). Therefore, this Court concludes that Defendants lack standing to collaterally attack the procedure utilized to designate the PIJ.

Even if this Court concluded that Defendants could challenge the procedure employed in designating the PIJ, this Court would conclude that AEDPA's and IEEPA's designation procedure is facially constitutional. The Supreme Court has stated that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The Supreme Court has also held that aliens are generally not entitled to constitutional rights until they are within the United States' territory and develop a substantial connection to the United States. *See Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (distinguishing the constitutional rights of an alien who entered the United States with the lack of constitutional rights for an alien who has not entered the United States); *United States v. Verdugo–Urquidez*, 494 U.S. 259, 269, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (holding Fifth Amendment protections do not extend to aliens outside the territorial boundaries of the United States).

AEDPA's and IEEPA's designation procedures are constitutional when they apply to foreign organizations and individuals without a substantial connection to the United States. Therefore, Defendants' facial challenge fails. By AEDPA's and IEEPA's very terms, the acts' designation procedures primarily apply to foreign organizations and individuals.[53] In such limited and exceptional circumstances, this Court holds that the facial analysis of a statute, like AEDPA or IEEPA, should include application to foreign organizations and individuals without a substantial connection to the United States. This Court disagrees with the *Rahmani* court that such an analysis would "effectively eviscerate the doctrine of facial invalidity." 209 F.Supp.2d at 1056. Instead, this Court concludes that such an analysis prevents this Court from intruding into an area that "the Judiciary has neither aptitude, facilities nor responsibility [, which] ... belong[s] to the domain of political power not subject to judicial intrusion or inquiry." *Chicago & Southern Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948); *see also Zadvydas v. Davis*, 533 U.S. at 696, 121 S.Ct. 2491 (stating that "heightened deference [is due] to the judgments of political branches with respect to matters of national security.")

Finally, even if Defendants could challenge the designation procedures as ap-

---

**53.** *See, e.g.,* 8 U.S.C. § 1189(a)(1)(A) (stating that in order to be a FTO "the organization is a foreign organization"); 31 C.F.R. § 595.304 (defining "foreign person" as "any citizen or national of a foreign state (including any such individual who is also a citizen or national of the United States), or any entity not organized solely under the laws of the United States or existing solely in the United States ...."); *id.* § 595.311 (requiring a SDT designated by the Secretary of State be a foreign person); Exec. Order No. 12947, § 1(a)(i), 60 Fed.Reg. 5079 (1995) (requiring a SDT designated by the Secretary of State be a foreign person); *id.* § 2(d) (defining "foreign person" as any person who is not solely a citizen of the United States or any entity that is not organized exclusively under United States law, but does not include a foreign State).

plied to the PIJ, this Court would conclude that AEDPA's and IEEPA's designation procedures did not violate the due process rights of the PIJ. None of the Defendants argue that the PIJ has property in or a substantial connection to the United States. At best, it appears that the PIJ has members in the United States who themselves own property in the United States. The United States Court of Appeals for the District of Columbia has twice concluded that a foreign organization's due process rights were not violated by AEDPA's designation procedure in such circumstances.[54] *See 32 County Sovereignty Committee v. Dep't of State*, 292 F.3d 797, 799–800 (D.C.Cir.2002); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C.Cir.1999). Without any compelling reason why the PIJ should be treated differently, this Court concludes that the PIJ had no right to due process under the Constitution because it has no substantial connection to the United States. Therefore, this Court denies Defendants' motions to dismiss the Indictment for alleged due process violations of the PIJ's rights.

### 4. EX POST FACTO

██ Finally, Defendants argue that Counts 1 through 4 attempt to punish the Defendants for conduct that was not criminal when it took place in violation of the *ex post facto* clause of the Constitution. Defendants argue that this Court should strike any overt act or reference to an act that occurred prior to PIJ's designation as

a FTO (October 8, 1997) or prior to PIJ's designation as a SDT (January 23, 1995). Alternatively, Defendants argue that this Court should strike any act prior to the respective designation date from Counts 3 and 4. The government responds that the Defendants' conduct in this case has always been unlawful and that the PIJ's designation as a SDT and a FTO provided additional bases for criminal liability. The government also responds that conduct prior to either designation date is relevant to Counts 3 and 4 because Defendants are charged with being in conspiracies that continued after the conduct was criminalized and acts prior to the designation dates go to the existence of a conspiracy, the parties' agreement, and Defendants' purpose, motive, and intent.

Neither of Defendants' arguments are well taken. Defendants are correct only to the extent that the *ex post facto* clause prohibits the enactment by Congress of a statute that punishes an act which was innocent when committed.[55] *See United States v. Hersh*, 297 F.3d 1233, 1244–45 (11th Cir.2002). However, Counts 1 and 2 of the Indictment seek to punish Defendants for violating 18 U.S.C. §§ 1962(d) and 956(a)(1). Both statutes were enacted (1970 and 1948 respectively) well prior to any act alleged in the Indictment. As to Counts 3 and 4, the Eleventh Circuit has held that the *ex post facto* clause was not violated when a conspiracy continues after the effective date of a statute making that action illegal.[56] *See Hersh*, 297 F.3d at

---

**54.** This Court would again note that the regulations under IEEPA appear to provide a SDT more procedural protections than an FTO receives under AEDPA. Defendants argument largely fails to distinguish between the two.

**55.** The *ex post facto* clause reads: "[n]o Bill of Attainder or ex post facto Law shall be passed." *See* U.S. Const. Art. I, § 9, cl. 3.

**56.** In *Hersh*, the Eleventh Circuit held that a conspiracy continues when at least one overt

act occurs after the effective date of the statute that made the conspiracy illegal. *See id. Hersh* involved a defendant who was charged with conspiracy to travel in foreign commerce to engage in a sexual act with a minor. *See id.* at 1245. The indictment alleged 17 overt acts in furtherance of the conspiracy, only two of which were illegal when they occurred. *See id.* The Eleventh Circuit concluded that there was no *ex post facto* concerns in that particular case and utilized the

1244–45. The Indictment alleges overt acts in furtherance of the conspiracy after 1995 and 1997. Therefore, this Court denies Defendants' motions to dismiss or strike on *ex post facto* grounds.

## B. TECHNICAL AND PROCEDURAL ISSUES

### 1. INSUFFICIENCY OF THE INDICTMENT

Defendants also argue that the Indictment violates their Fifth and Sixth Amendment rights by giving them insufficient notice of the crimes with which they are charged such that Defendants cannot prepare an adequate defense. For example, Defendants claim Count 1 provides insufficient notice of what two predicate acts Defendants knowingly or intentionally agreed would be committed by the conspiracy.[57] Defendants also argue that these infirmities cause a second due process violation because they do not give Defendants notice of the potential penalty in violation of *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) and *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Finally, Defendants argue that certain counts and allegations contained in the Indictment should be dismissed or stricken because the government has admitted that it misidentified the speaker or its identification of the speaker is suspect. This Court concludes that Defendants' motions challenging the sufficiency of the Indictment should be denied.

### a. Sufficiency of the Indictment

Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment "must be a plain, concise, and definite written statement ...." Fed. R.Crim.

Proc. 7(c). An indictment is sufficient if it: (1) sets forth each essential element of the offense so that a defendant has notice of the charges against which he must defend; and (2) enables a defendant to enter a plea which will act as a bar against subsequent prosecutions for the same offense. *See United States v. Poirier,* 321 F.3d 1024, 1028–29 (11th Cir.2003). The Supreme Court has stated that an indictment normally is sufficient when it "set[s] forth the words of the statute itself ...." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *see also United States v. Critzer,* 951 F.2d 306, 308 (11th Cir.1992) (per curiam) (holding same). Further, the Eleventh Circuit has stated that " '[w]hen analyzing challenges to the sufficiency of an indictment, courts give the indictment a common sense construction, and its validity is to be determined 'by practical, not technical, considerations.' '" *Poirier,* 321 F.3d at 1029 (quoting *United States v. Gold,* 743 F.2d 800, 813 (11th Cir.1984)). This means that it is proper for a court to infer or imply essential elements of a crime. *See id.* at 1029 (finding indictment sufficient even though indictment failed to allege that documents were "confidential"); *United States v. Woodruff,* 296 F.3d 1041, 1047 (11th Cir.2002) (inferring knowingly into an indictment); *United States v. Gray,* 260 F.3d 1267, 1283 (11th Cir.2001) (same). This Court turns to an analysis of each count challenged by Defendants.

### 1. Count 1—Conspiracy to Commit Racketeering

 Count 1 charges Defendants with a Conspiracy to Commit Racketeering in violation of 18 U.S.C. § 1962(d). Section 1962(d) makes it unlawful for "any person to conspire to violate any of the provisions

---

defendant's overt acts prior to the conspiracy becoming illegal to establish the defendant's intent. *See id.* at 1246–47.

**57.** This defect allegedly exists because the grand jury did not include the word "personally" in Paragraph 27 of Count 1 of the Indictment.

of subsection (a), (b), or (c)" of Section 1962. *See* 18 U.S.C. § 1962(d). The Indictment charges that the Defendants conspired to violate Section 1962(c).[58] In order to sustain a conviction under Section 1962(d) the government must prove that a defendant "objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise." *United States v. Shenberg*, 89 F.3d 1461, 1471 (11th Cir.1996). The government can meet this burden by showing either that: (a) the defendant agreed to the overall conspiracy's objective; or (b) the defendant personally committed two predicate acts. *See id.* The government can show an agreement with a conspiracy's overall objective by showing "that 'each defendant must necessarily have known that the others were also conspiring to participate in the same enterprise through a pattern of racketeering activity.'" *Id.* (quoting *United States v. Gonzalez*, 921 F.2d 1530, 1541 (11th Cir.1991)).

The Indictment states that, from 1984 through the date of the Indictment, Defendants:

> being persons employed by and associated with the enterprise described in Section A of this Count; that is, the PIJ Enterprise, which enterprise engaged in, and its activities affected, interstate and foreign commerce, knowingly, willfully, and unlawfully did combine, conspire, confederate, and agree together and with other persons, both known and unknown to violate Title 18, United States Code, Section 1962(c); that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of

that enterprise, through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and (5) . . . .

Indictment at Count 1, ¶ 26.

Previously, Count 1 defined the criminal enterprise as the "PIJ enterprise" [59] utilizing the language of 18 U.S.C. § 1961(4). *See id.* ¶ 25. The Indictment also lists seven types of racketeering activity, including murder, extortion, money laundering, and providing material support to a foreign terrorists. *See id.* Count 1 alleges that "[i]t was further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise." *See id.* ¶ 27. The Indictment then details the means and methods of the conspiracy alleged in Count 1 by providing more detail to the general types of racketeering activity alleged. *See id.* ¶¶ 28–42. Finally, the Indictment details the factual basis supporting the RICO conspiracy charge by detailing 256 overt acts. *See id.* ¶ 43.

Defendants argue that because Paragraph 27, quoted above, does not contain the word "personally" the Indictment provides them insufficient notice of what racketeering activity the government intends to prove that they agreed the enterprise would commit. First, this Court disagrees with Defendants that by failing to include the word "personally" the government is in any way limited in proving a conspiracy. The government is correct that the word "conspirator," contained in Paragraph 27, could be fairly read as either a co-defendant, a defendant himself, or an unindicted

---

**58.** Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

**59.** The Indictment specifically defines that phrase as "[t]he Palestinian Islamic Jihad, Jihad–Shiqaqi Faction (PIJ). including the ICP, WISE, IAF, and others known and unknown . . . ." *Id.* ¶ 25.

co-conspirator personally committed the racketeering activity. Second, Count 1 of the Indictment tracks the language of the applicable statutes and provides the Defendants with more than sufficient notice of the charges.[60] The Indictment is highly specific and provides Defendants with the factual support and the government's legal theory as to each of the Defendants' role and involvement in the RICO conspiracy. Therefore, this Court denies Defendants' motions to dismiss Count 1.

### 2. Count 2—Conspiracy to Murder, Maim, or Injure Persons at Places Outside the United States

 Count 2 of the Indictment charges Defendants with conspiring to murder, maim, or injure persons at places outside the United States in violation of 18 U.S.C. § 956(a)(1).[61] In order to sustain a conviction under Section 956(a)(1), the government must prove: (1) Defendants agreed with at least one person to commit murder, engage in kidnapping, or maim a person outside the United States; (2) Defendants willfully joined the agreement with the intent to further the conspiracy's purposes; (3) during the conspiracy, at least one of the conspirators must commit at least one overt act in furtherance of the objects of the conspiracy; and (4) at least one of conspirators was within the United States when the agreement was made. *See United States v. Wharton*, 320 F.3d 526, 537–38 (5th Cir.2003).

Count 2 of the Indictment alleges that from about 1988 and continuing through the date of the Indictment the Defendants "knowingly, unlawfully, and willfully, combined, conspired, confederated and agreed together and with each other ... to murder and maim persons at places outside of the United States." Indictment at 85–86. Count 2 incorporates the means and methods section of Count 1 and some of the overt act section (Paragraphs 191–255) to allege the overt acts committed in furtherance of the conspiracy. *See id.* at 86.

Count 2 of the Indictment tracks the language of the applicable statutes and provides Defendants with more than sufficient notice of the charges.[62] The Indictment is highly specific and provides Defendants with the factual support and the government's legal theory as to each of the Defendants' role and involvement in this conspiracy. Therefore, this Court denies Defendants' motions to dismiss Count 2.

### 3. Count 3—Conspiracy to Provide Material Support

 Count 3 of the Indictment charges Defendants with conspiring to provide the PIJ, a designated FTO, with material support in violation of 18 U.S.C. § 2339B. Under Section 2339B(a)(1), it is unlawful for persons to "knowingly provide[ ] material support or resources to a foreign terrorist organization, or attempt[ ] or con-

---

**60.** Several of Defendants move to dismiss Count 1 on grounds that there is not sufficient evidence to support a criminal conviction. Such a motion is an inappropriate pretrial motion. *Critzer*, 951 F.2d at 307.

**61.** Section 956(a)(1) provides that:
Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if

committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy be punished as provided in subsection (a)(2).
18 U.S.C. § 956(a)(1).

**62.** Several of Defendants move to dismiss Count 2 on grounds that there is not sufficient evidence to support a criminal conviction. Such a motion is an inappropriate pretrial motion. *Critzer*, 951 F.2d at 307.

spire[ ] to do so ...." 18 U.S.C. § 2339B. The term "material support" is defined to mean "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." *Id.* § 2339A(b); *id.* § 2239B(g)(4).

Count 3 of the Indictment alleges from about 1988 through the date of the Indictment Defendants conspired with each other "to knowingly provide material support and resources, as that term is defined in Title 18, United States Code, Section 2339A(b) to a designated foreign terrorist organization, namely, the Palestinian Islamic Jihad (PIJ), all in violation of Title 18, United States Code, Section 2339B." Indictment at 87–88. The Indictment then provides a mean and methods section, which provides Defendants notice of what types of material support Defendants allegedly provided to the PIJ. *See id.* at 87–95. The Indictment additionally reincorporates Paragraphs 197–255 of the overt acts section of Count 1, providing Defendants with notice of the specific factual allegations against them. *See id.* at 95.[63]

Defendants' argument that they cannot discern what types of material support were allegedly given by them to the PIJ is not well taken. A straight forward, common sense reading of either the "Means and Methods of the Conspiracy" or the "Overt Acts" sections of Count 3 clearly indicates the government's theory on what type of material support Defendants allegedly provided. For example, Paragraph 3(a) of Count 3 indicates that Defendants

"use[d] WISE, ICP, and IAF offices ... to raise funds and provide support for the PIJ ...." *See id.* at 88. Such allegations clearly indicate that the government contends that Defendants provided material support in the form of "facilities" and "currency or other financial securities." The remainder of Count 3 provides Defendants with similar unambiguous detail.

Similarly, Defendants' arguments that allegations in Paragraphs 3(s) and 3(u) are vague and provide insufficient notice are also not well taken. Defendants concentrate on the individualized words in sentences, divorcing those words from their context in a sentence, paragraph, and a series of paragraphs. For example, Defendants complain about the use of "support activities" as vague. However, the sentence reads that Defendants "would and did *continue* to engage in PIJ fundraising (sic) and support activities ...." Indictment at 94 (emphasis added).[64] The remaining portion of that paragraph details how Hammoudeh allegedly took over part of Al-Arian's fundraising role and the proceeding 18 paragraphs detail different types of support activities engaged in by Defendants prior to the time period detailed in 3(s). A common sense construction of Paragraph 3(s) provides Defendants with sufficient notice of what "support activities" the government contends were performed during this time period. This Court denies Defendants' motions to dismiss Count 3.

**4. Count 4—Conspiracy to Make and Receive Contributions of Funds, Goods, or Services to or for the Benefit of a SDT**

█ Count 4 of the Indictment charges Defendants with conspiring to make and

---

**63.** Several of Defendants move to dismiss Count 3 on grounds that there is not sufficient evidence to support a criminal conviction. Such a motion is an inappropriate pretrial motion. *Critzer,* 951 F.2d at 307.

**64.** Paragraph 3(u), likewise, uses the word "continue" before the allegedly objectionable phrase "activities in support" of the PIJ.

receive contributions of funds, goods, or services to or for the benefit of the PIJ, a SDT, in violation of 50 U.S.C. § 1705(b); 18 U.S.C. § 371; 31 C.F.R. §§ 595.204, 595.205. Section 371 makes it unlawful to conspire to commit any offense against the United States or defraud the United States. *See* 18 U.S.C. § 371. In order to sustain a conviction under Section 371, the government must prove: (a) an agreement to achieve an unlawful objective; (b) a defendant's knowing and voluntary participation; and (c) the commission of an overt act in furtherance of the conspiracy. *See United States v. Brenson*, 104 F.3d 1267, 1281–82 (11th Cir.1997) (quoting *United States v. Harmas*, 974 F.2d 1262, 1267 (11th Cir.1992)).

The unlawful objective in this case is violating IEEPA, the Executive Order, and the regulations thereunder. Section 1705(b) of IEEPA makes it unlawful to willfully violate or attempt to violate any regulation issued pursuant to IEEPA and provides for imprisonment of up to 10 years. *Id.* § 1705(b). The regulations issued pursuant to the Executive Order interpret the Executive Order as making it unlawful to "deal in property or interests in property of a ... [SDT], including the making or receiving any contribution of funds, goods, or services to or for the benefit of a [SDT] ...." 31 C.F.R. § 595.204.

Count 4 of the Indictment alleges that from a date unknown but not later than January 25, 1995, and continuing to the date of the Indictment the Defendants conspired:

> to commit offenses against the United States, that is, knowingly and willfully to violate Executive Order 12947, by making and receiving contributions of funds, goods, and service to or for the benefit of the Palestinian Islamic Jihad, ABD AL AZIZ AWDA, Fathi Shiqaqi and RAMADAN ABDULLAH SHALLAH, in violation of Title 50, United States Code, Sections 1701 *et seq.* and Title 31, Code of Federal Regulations, Section 595, *et seq.*

Indictment at 98–99. Count 4 incorporates the means and methods of the conspiracy section from Count 3 and Paragraphs 122–255 from the Overt Acts section from Count 1. *See id.* at 99.

Count 4 of the Indictment tracks the language of the applicable statutes, regulations, and the Executive Order and provides Defendants with more than sufficient notice of the charges.[65] The Indictment is highly specific and provides Defendants with the factual support and the government's legal theory as to each of the Defendants' role and involvement in this conspiracy count.[66] Therefore, this Court denies Defendants' motions to dismiss Count 4.

---

**65.** Several of the Defendants move to dismiss Count 4 on grounds that there is not sufficient evidence to support a criminal conviction. Such a motion is an inappropriate pretrial motion. *Critzer*, 951 F.2d at 307.

**66.** Defendants also argue that Count 4 should be dismissed because the government incorporated Part B of Count 3 and not Part C of Count 3 when it attempted to incorporate the "means and methods" section of Count 3. The use of B instead of C is a typographical or clerical error going to the form of the Indict-

ment. Count 4 of the Indictment makes clear that the government is incorporating the means and methods section of Count 3 and Defendants are not prejudiced by this Court correcting that error. *See United States v. Field*, 875 F.2d 130, 133–34 (7th Cir.1989). Though, this Court is baffled at why the government has not previously corrected this obvious error with a superseding indictment along with the Awda mistakes and some of the other inaccuracies raised in Defendants' motions to dismiss.

## 5. Counts 19, 36 through 38, 40 through 42, and 44—Travel in Interstate or Foreign Commerce or Use of Mail or Any Facility in Interstate or Foreign Commerce

 Counts 19, 36 through 38, 40 through 42, and 44 charge Defendants with violating what is known as the Travel Act, 18 U.S.C. § 1952.[67] In relevant part Section 1952(a) makes it unlawful for a person to:

> travel[ ] in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to . . . (2) commit any crime of violence to further any unlawful activity;[68] or (3) otherwise promote, manage, establish, carry on, facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform—(A) an act described in paragraph . . . (3) shall be . . . imprisoned not more than 5 years; or (B) an act described in paragraph (2) shall be . . . imprisoned for not more than 20 years . . . and if death results shall be imprisoned for any term of years or for life.

18 U.S.C. § 1952 (footnote added).

Counts 5 through 44 of the Indictment are collectively presented via a chart as violations of the Travel Act. *See* Indictment at 100–02. The Indictment alleges that on identified dates certain identified defendants "did knowingly and willfully use a facility as described below in interstate and foreign commerce with intent to" violate Sections 1952(a)(2) or 1952(a)(3).

*See id.* at 100. The Indictment identifies the unlawful activity as extortion and money laundering. *See id.* The chart then provides Defendants with a date, which Defendants were involved, the interstate or foreign commerce facility, and the corresponding overt act from Count 1, which is incorporated by reference and provides the factual background for the count. *See id.* at 100–02.

The Travel Act counts, Counts 19, 36 through 38. 40 through 42, and 44, of the Indictment, which Defendants challenged, track the language of the applicable statute and provide Defendants with more than sufficient notice of the charges.[69] The Indictment is highly specific and provides Defendants with the factual support and the government's legal theory as to each of the Defendants' role and involvement in each count. This Court denies Defendants' motions to dismiss Counts 19, 36 through 38, 40 through 42, and 44.

### b. *Apprendi* and *Jones*

Defendants' next argument, challenging the sufficiency of the Indictment on *Apprendi* and *Jones* grounds, is equally unavailing. In *United States v. Sanchez*, the Eleventh Circuit considered a similar argument and affirmed a district court's denial of a defendant's motion to dismiss. 269 F.3d 1250, 1275 (11th Cir.2001) (en banc). The Eleventh Circuit held that *Apprendi* has no effect on whether a complete federal crime is alleged in an indictment. *See id.* The Eleventh Circuit commented that "facing theoretical or po-

---

**67.** The Indictment also alleges a violation of 18 U.S.C. § 2. *See* Indictment at 102. Section 2 makes it unlawful to commit an offense against the United States or aid, abet, counsel, command, procure, or willfully cause the commission of an offense. *See* 18 U.S.C. § 2.

**68.** Section 1952(b) defines "unlawful activity" to include extortion and money laundering. *See* 18 U.S.C. § 1952(b).

**69.** Several of Defendants move to dismiss Counts 19, 36 through 38, 40 through 42, and 44 on grounds that there is not sufficient evidence to support a criminal conviction. Such a motion is an inappropriate pretrial motion. *Critzer*, 951 F.2d at 307.

tential exposure to a particular fate … borders on the metaphysical" and does not create *Apprendi* error. *See id.* at 1275–77. The Eleventh Circuit found such a concern of no consequence unless a defendant is sentenced above the otherwise applicable statutory maximum based on a statutory enhancement without being indicted on that enhancement, that enhancement being submitted to a jury, and that enhancement being proven beyond a reasonable doubt. *See id.* at 1276–78.

For the reasons stated in *Sanchez*, this Court concludes that dismissal on *Apprendi* or *Jones* grounds is inappropriate. Defendants' objections are premature at this point and this opinion should not be construed as determining any *Apprendi* or *Jones* issue that may be raised if these Defendants are convicted. However, this Court is aware that the Magistrate raised several potential *Apprendi* type issues in its Order (Dkt.# 428) on the Defendants' Motions for Bill of Particulars. Of course, the government may decide to try to avoid having a potential *Apprendi* issue by obtaining a superseding indictment correcting the issues raised by either Defendants or the Magistrate.

### c. The Government's Misidentification of Awda

Defendants also move to dismiss Counts 35, 37, 41, and 43 and also strike Paragraph 43(236), 43(240), 43(247) and 43(253) of Count 1 of the Indictment. Defendants argue that the government's admission that Awda was misidentified in Paragraphs 43(253) and his identification in 43(236), 43(240), and 43(247) is suspect and makes these paragraphs irrelevant, prejudicial and inflammatory. The government responds that Fariz and Ballut are not challenging the relevance of these subparagraphs, but are instead attacking the sufficiency of the evidence supporting the Indictment. Further, the government argues that dismissal is an inappropriate sanction in this case because Defendants have not alleged prosecutorial misconduct. At oral argument, the government indicated that it was likely to seek a superseding indictment, correcting the misidentification and suspect identifications of Awda as well as other errors in the Indictment.

This Court concludes that the motion to dismiss or strike these counts should be denied without prejudice. This Court is denying Defendants' motion because it challenges the sufficiency of the evidence. This Court does not understand why in the past twelve months since learning of this and other mistakes the government has not superseded the Indictment.[70] While baffled and confused at this failure to act and moot Defendants' arguments, nothing in the record indicates that the misidentifications and suspect identifications resulted from prosecutorial misconduct. In such circumstances, the Eleventh Circuit has repeatedly held that this Court may not dismiss an indictment despite mistaken testimony before a grand jury. *See United States v. Garate–Vergara*, 942 F.2d 1543, 1550 (11th Cir.1991) (citing cases). Accordingly, Defendants' motions to dismiss or strike based on the suspect or misidentification of Awda are denied.

### 2. MOTION TO QUASH ¶ 26(b)-EXTORTION

◼ Next, Defendants move to quash Paragraph 26(b) of Count 1 of the Indictment, arguing that this Court should quash extortion as a racketeering activity in this case because the government failed to allege that the PIJ enterprise obtained

---

**70.** Unlike some of the other errors in the Indictment, misidentifying Awda is substantive and not a clerical error of the type curable under Rule 36 of the Federal Rules of Criminal Procedure. Transactions with or involving Awda subject a defendant to criminal liability because he is a SDT.

or attempted to obtain property. The government argues that the Indictment sufficiently alleges a legal and factual basis to support extortion as a racketeering activity. This Court disagrees with the government, grants Defendants' motion, and quashes Paragraph 26(b).[71]

The Indictment charges that the Defendants conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d). Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...." 18 U.S.C. § 1962(c). "Pattern of racketeering activity" is statutorily defined as at least two acts of "racketeering activity." *Id.* § 1961(5). In turn, "racketeering activity" is defined to include various crimes, including extortion "chargeable under State law and punishable by imprisonment for more than one year." *Id.* § 1961(1).

The Supreme Court has held to constitute the racketeering activity of "extortion" a state statute must exist that in a "generic sense" criminalizes the crime of extortion as it was understood in the majority of states and under the Model Penal Code. *See Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393, 409–10, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003). The Supreme Court has defined "generic" extortion statute as a statute that criminalizes " 'obtaining something of value from another with his consent induced by wrongful use of force, fear, or threats.' " *Id.* at 410, 123 S.Ct. 1057 (quoting *United States v. Nardello*, 393 U.S. 286, 296, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969)).

*Scheidler* involved a civil suit against multiple anti-abortion groups who alleged-ly conspired to shut down abortion clinics nationwide through a pattern of racketeering activity mainly by threats of violence. *See id.* at 398, 123 S.Ct. 1057. The plaintiffs alleged that the defendants' conduct constituted extortion because the defendants attempted to deprive plaintiffs of their right to receive and provide medical service. *See id.* at 400–01, 123 S.Ct. 1057. A jury found in plaintiffs' favor and awarded damages. *See id.* at 397, 123 S.Ct. 1057. The Supreme Court reversed finding that the defendants' conduct did not constitute extortion because the defendants did not obtain the plaintiffs' property when defendants' illegal acts shut down a clinic. *See id.* at 397, 404–05, 123 S.Ct. 1057. The Court stated that merely interfering or depriving someone of property was insufficient as a matter of law to constitute extortion. *See id.* at 405, 123 S.Ct. 1057.

Turning to the case at hand, it is undisputed that Florida law, specifically Florida Statutes § 836.05, makes chargeable the crime of extortion which is punishable by imprisonment of more than one year. All parties agree that Section 836.05 is a "generic" extortion statute. But, the parties disagree on whether the government alleges facts in the Indictment to support extortion as a racketeering activity. Specifically, Defendants argue that there is no allegation that the PIJ obtained or attempted to obtain property.

While the government cites to other parts of the Indictment, this Court's review of the Indictment indicates that in only one paragraph has the government even attempted to allege the PIJ obtained or attempted to obtain property. In Paragraph 29 of the Indictment, the government alleges that:

> The enterprise members would and did commit acts of violence, intimidation,

---

**71.** This Court rejects Defendants remaining arguments on Paragraph 26(b).

and threats against Israel, its inhabitants and others, including murders and suicide bombings, and solicit and cause others to do so, with the intent to drive Israel out of the territory from the Jordan River to the Mediterranean Sea and to end any influence of the United States in the Middle East.

Indictment ¶ 29.

The government concedes in its response that these allegations "inarticulately" state an extortionate scheme. While most of the Indictment is clear and specific, Paragraph 29 is not.

Paragraph 29 never alleges that any of the current owners of the real estate (or the property or thing of value that is allegedly being extorted) in any way lose title to that real estate. What the PIJ attempted to extort according to Paragraph 29 is Israeli sovereignty over property between the Jordan River and the Mediterranean Sea. In light of *Scheidler*, this Court is in serious doubt whether such an intangible property right is capable of being extorted. *See* 537 U.S. at 410–411, 123 S.Ct. at 1069 (Stevens, J., dissenting) (stating that the majority opinion construed extortion to cover nothing more than acquisition of tangible property). Sovereignty is even more of an amorphous concept than the alleged property rights, the right to receive and perform medical services, in *Scheidler*. Further, while undoubtedly sovereignty has "value" in some sense of that word, sovereignty does not have value in the economic sense that is used in extortion statutes.[72] Because the Indictment fails to allege that Israel or any other person lost or could have lost anything of value, this Court grants Defendants' motion.[73]

### 3. MOTION TO STRIKE SURPLUSAGE

#### a. "Terrorism," "terrorist" and "terrorist activity"

 Defendants move to strike the words "terrorism," "terrorist" and "terrorist activity" from the Indictment. The standard for striking surplusage is "exacting" and requires it to be clear that the allegedly surplus language is irrelevant to the charge and is also inflammatory and prejudicial. *Huppert*, 917 F.2d at 511. This Court cannot conclude that the use of the words "terrorism," "terrorist," and "terrorist activity" are irrelevant. First and foremost, an essential element of two of the charges against Defendants is that they supported and conducted prohibited transactions with groups designated by the United States as terrorists. Second, the government can prove Defendants' participation, intent, and the existence of the four conspiracies alleged in the Indictment in part by showing the acts of the groups with which he was affiliated with and aided committed terrorist acts. *See United States v. Bin Laden*, 91 F.Supp.2d 600, 621–22 (S.D.N.Y.2000) (refusing to strike "terrorist groups").

would make one additional comment. The Indictment as written termed Israel as both Israel proper and the occupied territories. It seems to this Court that an extortionate scheme might differ between Israel proper and the occupied territories. By grouping them together the government may be making it difficult to understand and unnecessarily require proof and complicated explanation by the government of the international status of the occupied territories.

---

**72.** Similarly, Paragraph 29 never alleges that the PIJ, a co-conspirator of the PIJ, individuals associated with the PIJ, or others will receive legal title to anything of value. The Indictment does not indicate who under this alleged scheme would end up with sovereignty over the territory between Jordan and the Mediterranean Sea.

**73.** In the event that the government attempts to supersede this Indictment and re-allege extortion as a racketeering activity, this Court

Even if this Court could find "terrorist," "terrorism," and "terrorist activities" irrelevant, which it does not, it would not find the use of the words prejudicial. If this Court followed Defendants' logic, the government could use without objection the much longer detailed description of the unlawful activity instead of a short-hand succinct phrase like "terrorist attack." This Court concludes that use of these succinct phrases is far less prejudicial to the Defendants than allowing the government to continually repeat that "the PIJ murdered twelve people and injured several others," Indictment ¶ 254, or some other similar act(s) allegedly committed by the PIJ. This Court denies Defendants' motion to strike "terrorist," "terrorism," and "terrorist activities."

### b. Words indicating animus against the United States

Second, Defendants move to strike all phrases that indicate animus towards the United States. Defendants argue that such phrases are irrelevant to the charges against them and are also highly prejudicial. The government argues that such phrases are relevant to the nature and goals of the PIJ enterprise and show Defendants' motive and intent. At this stage, this Court will reserve ruling on Defendants' motion to strike these phrases until determining the language's relevance at trial. *See Awan,* 966 F.2d at 1426.

### c. Subparagraphs that do not allege illegal conduct

█ Third, Defendants move to strike from Count 1, Paragraph 43, Subparagraphs (208), (209), (211), (215), (238), (239) and (244). Defendants argue that these subparagraphs do not contain allegations: (a) of an illegal act; (b) in furtherance of any of the conspiracies; or (c) showing an intent to commit an illegal act. The government responds that each of these subparagraphs is relevant because each goes, individually or collectively, to: (1) the exis-

tence of the conspiracies; (2) Defendants' participation and agreement in the conspiracies; (3) illegal acts or activities; or (4) Defendants' state of mind or intent, including their knowledge of the PIJ enterprise. This Court has reviewed the allegations in the subparagraphs and agrees with the government that, while some of the subparagraphs do not contain illegal activity in themselves, each is probative of other issues related to the conspiracies alleged in this case. *See United States v. Lanier,* 920 F.2d 887, 893 (11th Cir.1991) (stating that "an overt act need not be criminal, and may indeed be otherwise innocent . . . ."); *United States v. Morse,* 851 F.2d 1317, 1320 (11th Cir.1988) (stating that activity supporting a conspiracy charge need not be illegal in and of itself); *United States v. LaChance,* 817 F.2d 1491, 1494 (11th Cir.1987) (holding similarly). This Court denies Defendants' motions to strike surplusage on this ground.

### d. Words indicating other co-conspirators or unindicted criminal conduct

Fourth, Defendants move to strike language from the indictment that indicates that there are other unmentioned co-conspirators or other unindicted criminal conduct by these Defendants. The conspiracy sections (Counts I through 4) of the Indictment repeatedly refer to other known and unknown co-conspirators. Additionally, the Overt Act section of Count 1 contains one assertion that the Defendants and their co-conspirators committed certain overt acts "among others." Defendants argue that such reference invites a jury to improperly infer that Defendants were involved in other acts or with other persons not charged in the Indictment.

However, well established law in this circuit holds that "the government is not limited to the overt acts pleaded in the indictment in proving a conspiracy; it may show other acts of the conspirators occur-

ring during the life of the conspiracy." *United States v. Elliott,* 571 F.2d 880, 911 (5th Cir.1978) (affirming denial of bill of particulars); *see also United States v. Lockheed Corp.,* case no. 1:94–cr–226, 1995 WL 17064093, at *6–7 (N.D.Ga. Jan.3, 1995) (refusing to strike "among others" in an overt act section as surplusage). Similarly, it is common to see allegations of other unnamed persons being involved in a conspiracy. *See, e.g., United States v. Briggs,* 514 F.2d 794, 805 (5th Cir.1975) (requiring the use of "other persons" or fictitious names in an indictment instead of real names of unindicted co-conspirators). This Court notes that lack of notice and unfair surprise are not likely in this case because the Magistrate ordered the government to provide by way of bill of particulars most of this information. While this Court believes that these phrases are likely relevant to this case, this Court will reserve ruling on Defendants' motion to strike these phrases until determining the language's relevance at trial.

### e. Close associate of Al–Arian, Hammoudeh, and Ballut

While not presenting any argument or even mentioning the word in his motion, Defendant Fariz highlighted the word "close" on page 5 of the Indictment, indicating that he wishes the word stricken. The government argues that the level and depth of his relationship with his co-defendants is probative to the existence of the four conspiracies and the likelihood of Fariz's and the other Defendants' participation in them. This Court agrees and Fariz's motion to strike is denied as to this ground.

### f. The charter

Finally, while again not presenting any argument or making any mention of it in

his motion, Defendant Fariz highlighted subsection 1 of subparagraph (186) on page 66 of the Indictment. The subsection he requests to be stricken states that Defendant Al–Arian had in his possession a document detailing how to establish, operate, and structure a hostile intelligence organization at a university. The government argues that the document is probative of the plans, means, and methods of operation for the conspiracies alleged in the Indictment. This Court agrees and Fariz's motion to strike is denied on this ground.

### 4. STATUTE OF LIMITATIONS

Defendant Ballut moves to dismiss Count 19, arguing that the statute of limitations has expired for an offense allegedly committed in May 24, 1995. Ballut's argument consists of less than a sentence and provides this Court with no citations or arguments. Probably because of the offhand nature of Ballut's argument, the government failed to respond to it. Therefore, this Court will give Defendant Ballut and the government an opportunity to brief this issue before it rules upon it.

### C. APPEAL OF BILL OF PARTICULARS

Defendants Ballut and Fariz also appeal the Magistrate's Order granting in part and denying in part their motions for bill of particulars (Dkt.# 428). The Magistrate granted Defendants' motions in so far as they sought: (a) the identity of the unindicted co-conspirators; (b) the identity of the individual(s) in Paragraph 43(236), (240), (247), and (253); and (c) co-conspirators associated with PIJ mentioned in Count 2.[74] The Magistrate denied the re-

---

74. The Magistrate also required that the government turn over or show cause why it cannot turn over the Israeli documents within thirty (30) days. The Israeli documents will provide Defendants with critical information such as names of victims, suspects, and witnesses to the alleged PIJ terrorist attacks.

maining demands for particulars, finding that Defendants were seeking to use the bill of particulars as a means of getting particularized discovery.

Pursuant to 28 U.S.C. § 636(b)(1)(A), this Court may reconsider any pretrial matter referred to a magistrate and reverse the magistrate's decision where it is shown that the decision is clearly erroneous or contrary to law. Defendants argue that the magistrate erred when he failed to require the government to provide particulars as far as: (a) identities of individuals named in the Indictment; (b) allegations of criminal conduct; (c) coded conversations; (d) dates that Defendant Ballut joined the four conspiracies; and (e) citations to legal authority for prosecution of a crime that occurred prior to a particular date.

Under Rule 7(f) of the Federal Rules of Criminal Procedure, a court may direct the government to file a bill of particulars. The purpose of a bill of particulars is to: (1) inform a defendant of the charges so that a defendant can prepare a defense; (2) avoid surprise at trial; and (3) enable a defendant to plead double jeopardy. *See United States v. Anderson,* 799 F.2d 1438, 1441 (11th Cir.1986). A bill of particulars is not a means to obtain generalized discovery. *See United States v. Warren,* 772 F.2d 827, 837 (11th Cir.1985). It is an appropriate way to discover the names of the unindicted co-conspirators who the government plans to use as witnesses at trial. *See United States v. Barrentine,* 591 F.2d 1069, 1077 (5th Cir.1979). However, a bill of particulars is not typically warranted in so far as it seeks information already available through other sources. *See United States v. Rosenthal,* 793 F.2d 1214, 1227 (11th Cir.1986).

After reviewing Defendant Ballut's and Fariz's motions, this Court concludes that the motions for reconsideration should be denied. Many of the specific requests are foreclosed for the very reasons that this Court has stated earlier in this Order. For example, Ballut's request for citation of legal authority for prosecution of a crime that occurred prior to a particular date need look no further than the *ex post facto* section (Section II(A)(4)) of this Order. Similarly, most of Fariz's arguments regarding the vagueness of the allegations in the Indictment have been exhaustively addressed in the insufficiency of the indictment section (Section II(B)(1)) of this Order. For instance, this Court has already concluded that the Indictment is not vague on what type(s) of material support the Defendants provided the PIJ. Similarly, this Court has concluded that it is premature to address *Apprendi* and *Jones* concerns.

This Court would also note that the Magistrate has already given Defendants in his Order the names of the known co-conspirators for Counts 2, 3, and 4 because many of the sections of Count 1 of the Indictment are incorporated by reference into Counts 2, 3, and 4. Additionally, several of the Magistrate's recent orders, particularly the Order (Dkt.# 428) on the bill of particulars and the Order (Dkt.# 437) on various discovery motions, have significantly reduced the burden on the defense in preparing for trial.

A common sense look at the Indictment, especially the overt act section, makes obvious what FTOs, SDTs, known terrorists, and terrorist organizations are involved in this case. Similarly, it should be equally obvious when one reads the overt acts in Paragraph 43 what coded conversations the government is alleging. Therefore, this Court denies Ballut and Fariz's motion for reconsideration of the Magistrate's Order (Dkt.# 428).

It is therefore **ORDERED AND ADJUDGED** that:

1. Defendant Ballut's Motion to Dismiss or Strike Counts 1 through 4, 19, 36

through 38, and 40 through 42 (Dkt.# 200) is **DENIED in part and DEFERRED in part** as detailed in this Order.

2. Defendant Ballut shall file within **FIVE (5) DAYS** from the date of this Order a legal memorandum of no more than **FIVE (5) PAGES** addressing the applicability of the statute of limitations to Count 19. The government shall file a response **FIVE (5) DAYS** after the date of service of no more than **FIVE (5) PAGES**.

3. Defendant Al–Arian's Motion to Dismiss Counts 1, 2, 3 and 4 of the Indictment (Dkt.# 245) is **DENIED**.

4. Defendant Fariz's Motion to Dismiss Count 44 of the Indictment (Dkt.# 250) is **DENIED**.

5. Defendant's Fariz's Motion to Strike Surplusage (Dkt.# 251) is **DENIED in part** and **DEFERRED in part** as detailed in this Order.

6. Defendant Fariz's Motion to Dismiss Count 1 of the Indictment (Dkt.# 255) is **DENIED**.

7. Defendant Fariz's Motion to Strike as Surplusage Paragraphs 43(236), (240), (247), and (253) of the Indictment, and to Dismiss Counts 35, 37, 41, and 43 of the Indictment (Dkt.# 256) is **DENIED without prejudice**.

8. Defendant Al–Arian's Amended Motion to Dismiss Counts 1, 2, 3 and 4 of the Indictment (Dkt.# 273) is **DENIED**.

9. Defendant Fariz's Motion to Dismiss Counts 3 and 4 of the Indictment (Dkt.# 301) is **DENIED**.

10. Defendant Fariz's Motion to Quash Section (b) of Paragraph 26 of the Indictment for Failure to State a Legal Basis for Relief (Dkt.# 302) is **GRANTED**.

11. Defendant Fariz's Request for Oral Argument on Defendant's Pretrial Motions (Dkt.# 303) is **DENIED as moot**.

12. Defendant Hammoudeh's Motion to Dismiss Count 1 of the Indictment (Dkt.# 313) is **DENIED**.

13. Defendant Hammoudeh's Amended Motion to Dismiss Count 1 of the Indictment (Dkt.# 330) is **DENIED**.

14. Defendant Fariz's Motion for Reconsideration of Magistrate Judge's Order Denying in Part Fariz's Motion for Bill of Particulars (Dkt.# 440) is **DENIED**.

15. Defendant Ballut's Motion for Reconsideration of Motion for Bill of Particulars (Dkt.# 441) is **DENIED**.